IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK ROBERTSON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 3:13-CV-728-G-BK |
| | § | |
| | § | (Death Penalty Case) |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

# PETITION
## FOR A WRIT OF HABEAS CORPUS
and
### *Exhibits*

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................ ii

TABLE OF ABBREVIATIONS.................................................. v

INTRODUCTION............................................................ 1
    A.    Basis of Confinement............................................... 1
    B.    Overview of Procedural History..................................... 2
          1.    The 1991 Trial, Direct Appeal & State/Federal Habeas Proceedings..... 2
          2.    The 2009 Trial, Direct Appeal & State Habeas Proceedings........... 3

STATEMENT OF FACTS..................................................... 4
    A.    Pre-trial ......................................................... 4
          1.    On July 1, 2008, the defense attorneys filed an *ex parte* motion for a "forensic psychologist," Kelly Goodness, Ph.D. Under the heading, Mitigation Evaluation and Investigation, the Goodness Engagement Contract states: *"You can expect that I would put in 120 to 160 hours [doing mitigation investigation] prior to completing the evaluation"*.......... 4
          2.    Defense counsel was aware that Dr. Goodness' invoices reflected she had conducted less than 42.16 hours of "mitigation investigation" by the date the trial began; 37 of those hours, were for investigation conducted only two months before the June 22, 2009 opening arguments. ................. 6
          3.    The Collateral Interview List shows the interviews were confined to the maternal side of the family.................................... 7
    B.    The Trial.......................................................... 8
          1.    The State's 2009 Presentation..................................... 8
          2.    The Defense 2009 Presentation..................................... 8
                a.    In opening, the defense promised to take the jury "on a quest ... *to understand every single aspect* that led Mark Robertson from being a small boy in El Monte ... to the man who is sitting before you today"............................................... 8
                b.    Only three lay witnesses were called by the defense to testify. They portrayed Mark's life in ways substantially similar to how he had been portrayed in the 1991 trial........................... 9
                c.    Mark was portrayed as the "favorite;" he was reared in a safe, crime-free California neighborhood.............................. 9
                 d.    Christi Compton, Ph.D, the defense expert................. 10
                     (1)    testified in a *subrosa* hearing, that she would be testifying to the "genetic and social influences, to how [Mark] arrived at where he is at and his potential mental state at the time of the offenses and his current psychological functioning"..... 10
                     (2)    testified before the jury that Mark had a genetic link for ASPD because she "believed" that his father was "either a

psychopath or sociopath"...........................11

(3)    suggested to the jury that Mark had RAD.............12

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS...........................14

GROUND ONE (IAC & *Wiggins* – Failure to Adequately Investigate & Develop Mitigating Evidence):  Mr. Robertson was denied his federal 6th and 14th amendment rights to effective assistance of counsel, who unreasonably narrowed the scope of, and prematurely ceased, the investigation despite red flags that signaled further investigation needed to be done into Mark's mental state at the time of the offense, into maternal and paternal genetic-and-environmental influences, and into Mark's early childhood......................15

A.    Standard of Care:  The prevailing standard of care mandated a thorough and adequate investigation into the psychosocial history of Mr. Robertson. .......15

B.    Deficient Performance . ...........................................18

1.    Trial counsel prematurely ceased investigation, despite red flags signaling more investigation needed to be done into maternal-and-paternal genetic-and-environmental influences, and into Mark's early childhood...........18

a.    *Missing Significant Paternal Information*:  Other than anecdotal information from the immediate family that Mark's biological father was "a pretty violent, mean individual," the records show that the defense team had *no* actual communication with the paternal side of the family prior to the 2009 trial. ........................20

b.    *Missing Significant Maternal Information*: The records of the defense team reflect *no* reasonable investigation into Mark's birth and early developmental years; or the psychological, emotional, and physical health of his maternal caretaker(s) from Mark's birth to age 5, to reflect her ability to comfort and nurture Mark; this type of information is critical to support or refute Reactive Attachment Disorder (RAD)......................................21

c.    *Missing Early Childhood Years*:  The Records Review #1 List reflects little to no information about Mark's early childhood in California....................................................23

2.    Trial counsel had only a rudimentary knowledge, and prematurely terminated the investigation, before having an adequate understanding of the mental state underlying the behaviors of Mark Robertson. .................25

a.    *The Circle Tallant Stressor*:  Despite the red flags about the Circle Tallant Stressor, the defense team did not investigate its significance, or the correlation between the date of the termination of the live-in-relationship and Circle's abortion of Mark's child, and the date of the offense conduct. ....................................25

b.    *Mental illness*: Despite having reviewed records that sent up red flags, the defense team did no investigation into whether Mark suffered from a treatable mental illness, whose symptoms are substantially similar to ASPD. ..........................29

C.    Prejudice. ......................................................32

iii

GROUND TWO (Materially Inaccurate Evidence – 5th, 6th, 8th, 14th amendments):  Mr. Robertson was denied his federal 5th, 6th, 8th, and 14th amendment rights because his death sentence was based on materially inaccurate evidence from Warden Kelly. . . . . . . . . . . . . . . . . . . . . . . 35
 A. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
  1. Trial Testimony of Warden Nelson. . . . . . . . . . . . . . . . . . . . . . . . . 35
  2. Prosecutor's Closing Arguments and the Jury Notes.. . . . . . . . . . . . . . . 36
  3. The Motion for New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
  4. The Direct Appeal Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
 B. The TCCA ruling that Robertson "has not demonstrated that Warden Nelson's testimony was false or misleading," was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings". . . . . 41
  1. Warden Nelson's testimony was false and materially inaccurate, which the State failed to correct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
  2. Warden Nelson's testimony was not harmless.  The jury never learned of her materially inaccurate testimony in *Robertson* and in an unrelated capital case, *Lizcano* – which "relates to her credibility."  The jury relied on Nelson's testimony in its future dangerousness deliberations.. . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 1: Ex Parte Motion to Appoint Forensic Psychologist to Assist in Evaluation, Preparation, and Presentation of a Defense, A- Curriculum Vita, B- Terms of Engagement Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 2: Dr. Goodness Invoices Analyzed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 3: Collateral Interview List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 4: PI Hunt billing records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 5: Records Review #1 (TOC).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 6: Hector Becerra, LOS ANGELES TIMES, *El Monte is Down on Its Luck* (May 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 7: *Mental Illness & Violence:  Multiple Interacting Factors Contribute to Violent Behavior*, Harvard Medical School. . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 8: New York University Child Study Center, *Children's Resilience in the Face of Trauma* (July 9, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 Exhibit 9: Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011). . . . . . . . 49

## TABLE OF ABBREVIATIONS

The following are a list of abbreviations used within the pleading:

| | |
|---|---|
| CR __:__ | CR is the abbreviation for Clerk's Record of the 2009 punishment phase re-trial, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon. |
| 1991 CR __:__ | 1991 CR is the abbreviation for Clerk's Record of the 1991 trial, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon. |
| CWR__ | CWR is the abbreviation for Clerk's Writ Record of the state habeas proceedings that followed the 2009 punishment phase re-trial, which is a single volume. It is followed by the volume number (1) before the colon, and the page numbers after the colon where the cited material can be found |
| IATC | Ineffective-assistance-of-trial-counsel (IATC) claim |
| RAD | Reactive Attachment Disorder |
| RR __:__ | RR is the abbreviation for Reporter's Record of the 2009 punishment phase re-trial, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon. |
| 1991 RR __:__ | 1991 RR __:__ is the abbreviation for Reporter's Record of the 1991 trial, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation 1991 RR is followed by the volume number before the colon, and the page numbers after the colon. |
| TCCA | Texas Court of Criminal Appeals |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARK ROBERTSON,                        §
              Petitioner,        §
                           §
v.                                     §      CIVIL ACTION No. 3:13-CV-728
                           §
                           §      (Death Penalty Case)
                           §
WILLIAM STEPHENS, Director,            §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,    §
              Respondent.      §

MARK ROBERTSON (hereinafter also referred to as Petitioner or Robertson) petitions

pursuant to 28 U.S.C. § 2241 & 28 U.S.C.§ 2254 for a writ of habeas corpus because he is confined

by the State of Texas under a sentence of death, in violation of the laws and Constitution of the

United States.

MARK ROBERTSON is before this court following a 2009 punishment phase re-trial, in

which he was once again sentenced to death, and state habeas relief was denied by the state court

on January 9, 2013.

## INTRODUCTION

### A.    BASIS OF CONFINEMENT.

MARK ROBERTSON , inmate number #000-992, is confined by the Texas Department of

Criminal Justice, Correctional Institutions Division, Williams Stephens, Director,  TDCJ-ID.

1

Petitioner is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

### B.    OVERVIEW OF PROCEDURAL HISTORY

#### 1.    The 1991 Trial, Direct Appeal & State/Federal Habeas Proceedings

In 1991, Mr. Robertson was tried and convicted in the Criminal District Court No. 5, Dallas County, of capital murder committed in course of robbery, and was sentenced to death.   Under the 1989 Texas law, "The court also gave the jury a supplemental instruction in which it was told that Robertson could avoid a capital sentence-even if the answers to both questions were affirmative-should the jury find sufficient mitigating factors. To give effect to such a determination, the trial court instructed the jury to change its answer to either of the special issues from 'Yes' to 'No.'" [hereinafter "Nullification Instruction]. *Robertson v. Cockrell*, 325 F.3d 243, 245 (5th Cir. 2003) *abrogated by Tennard v. Dretke*, 542 U.S. 274 (2004).   In 1993, the Texas Court of Criminal Appeals (TCCA) affirmed the conviction and sentence on direct appeal. *Robertson v. State,* 871 S.W.2d 701 (Tex. Crim. App.1993).  The U.S. Supreme Court denied certiorari.  *Robertson v. Texas*, 513 U.S. 853 (1994).

The Nullification Instruction was the prominent feature in the subsequent state and federal habeas proceedings, but the courts denied Mr. Robertson's claim.  *See Ex parte Robertson,* Writ No. 30,077-01 (Tex. Crim. App.1998); *Robertson v. Johnson*, 234 F.3d 890 (5th Cir.2000); *Robertson v. Johnson,* 533 U.S. 901 (2001) (remand for reconsideration);  *Robertson v. Cockrell*, 325 F.3d 243 (5th Cir. 2003) (*en banc* denial of relief).  Mr. Robertson's scheduled execution was stayed in August 2003, after he had filed a subsequent application in the TCCA, again raising the Nullification Instruction claim.  On March 12, 2008, the TCCA reversed Mr. Robertson's death sentence and

remanded the case to the trial court for a new trial on punishment. *Ex parte Robertson*, AP-74,720, 2008 WL 748373 (Tex. Crim. App. Mar. 12, 2008).


### 2.  The 2009 Trial, Direct Appeal & State Habeas Proceedings

The 2009 new trial on punishment concluded with Mr. Robertson being sentenced to death again. The TCCA affirmed the death sentence on direct appeal. *Robertson v. State*, AP-71,224, 2011 WL 1161381 (Tex. Crim. App. Mar. 9, 2011). The U.S. Supreme Court denied certiorari. *Robertson v. Texas*, 132 S. Ct. 844 (2011).

On January 9, 2013, the TCCA denied state habeas relief. The TCCA "agree[d] with the trial judge's recommendation and adopt[ed] the trial judge's findings and conclusions, except for paragraphs 1, 2, and 3, which indicate that the allegation is procedurally barred. Based upon the trial court's findings and conclusions and [its] own review of the record, [the TCCA ruled that] relief is denied." *Ex parte Robertson*, WR-30,077-03, 2013 WL 135667 (Tex. Crim. App. Jan. 9, 2013).

On March 18, 2013, this Court appointed undersigned counsel to represent Mr. Robertson in his federal habeas litigation. [Doc #3]. This federal habeas petition is timely filed pursuant to that appointment.

## STATEMENT OF FACTS

A.      **Pre-trial**

1.      **On July 1, 2008, the defense attorneys filed an *ex parte* motion for a "forensic psychologist," Kelly Goodness, Ph.D.  Under the heading, Mitigation Evaluation and Investigation, the Goodness Engagement Contract states:** *"You can expect that I would put in 120 to 160 hours [doing mitigation investigation] prior to completing the evaluation"*

On April 7, 2008, the mandate issued from the TCCA, who had reversed Mr. Robertson's death sentence and remanded the case to the trial court for a new trial on punishment.  (CR 1:122). On May 19, 2008, the State of Texas again sought the death penalty.  (CR 1:126).  In response, and although there is no appointment order within the clerk's record, by at least June 2008, Mr. Richard Franklin and Ms. Robbie McClung had been appointed by the trial court.  *See* Attorney's Request for Bench Warrant signed by Mr. Franklin.  (CR 1:127).

The record reflects no ex parte request for a mitigation investigator.  Instead, on July 1, 2008, Ms. McClung, the defense trial attorney filed an "Ex Parte Motion to Appoint Forensic Psychologist to Assist in Evaluation, Preparation, and Presentation of a Defense." (CR 1:129); Exhibit 1:  Ex Parte Motion to Appoint Forensic Psychologist to Assist in Evaluation, Preparation, and Presentation of a Defense, A- Curriculum Vita, B- Terms of Engagement Contract.  Specifically, the defense requested the appointment of Kelly Goodness, Ph.D.  The motion recites:

> In order for ***Counsel*** to adequately prepare a defense in this case, he ***is required to investigate any and all mitigating factors regarding the Defendant***.  *Williams v. Taylor*, 529 U.S. 362 (U.S. Sup. Ct. 2006), IABA Standards of Criminal Justice 4-4.1, commentary, p. 4-55 (2nd edition 1980).  Therefore, ***the services of a forensic psychologist are necessary*** as a forensic psychologist can review the facts of this case,   review reports, interview and evaluate the Defendant, and examine the Defendant's background and character in order to shed light on potentially mitigating factors and to prepare and present mitigating evidence.  Ake v. Oklahoma, 470 U.S. 68 (1986).

> Neither the Defendant nor Counsel is sufficiently knowledgeable in psychology or psychiatry to determine and assess the precise significance of the Defendant's psychological or psychiatric condition or of the mitigating evidence in this case.

(Emphasis supplied) (CR 1:129-146).

Exhibit A to the motion was the Curriculum Vitae of Dr. Goodness.  (CR 1:132-140).  The Curriculum Vitae recites that Dr. Goodness is a mental health expert, licensed by the state of Texas in psychology.  Her Ph.D. was in Clinical Psychology.  Her Masters of Science degree was in Clinical Psychology.  Her Bachelor of Science was in Psychology.  (CR 1:132).

Exhibit B to the motion was the Terms of Engagement Contract from Dr. Goodness & Associates.  (CR 1:141-146).  It reads, in pertinent part:

> My engagement is limited to matters involving the above referenced case. Specifically, I shall provide the mitigation investigation services or limited psychological evaluation services that you select and initial below: ....

(CR 1:141).

The Engagement Letter details the terms for mitigation investigation services.  It reads:

> **Mitigation evaluation and investigation**.  ***You can expect that I would put in 120 to 160 hours prior to completing the evaluation*** and an additional 15 to 30 hours if testimony or trial consulting is necessary.  In addition, ***I sometimes utilize the services of a Social Worker and Psychological Associate to collect data, as their time is billed at a much lower rate thereby reducing the cost to the Court***.  The total estimated cost of mitigation services for a capital case with death specifications is $25,000 plus expenses which average between $3,000 and $6,000 depending on the case location and case requirements.  A court order and deposit as specified or a $25,000 retained is required.

(CR 1:143).

5

**2.    Defense counsel was aware that Dr. Goodness' invoices reflected she had conducted less than 42.16 hours of "mitigation investigation" by the date the trial began; 37 of those hours, were for investigation conducted only two months before the June 22, 2009 opening arguments**

Although the Engagement Contract recites that Dr. Goodness "sometimes utilize[s] the services of a Social Work and Psychological Associate to collect data," no other individual is named in the worksheets of Dr. Goodness as having performed the mitigation investigation.

Dr. Goodness' Engagement Contract, detailing the terms of the mitigation services, recites that she "would put in 120 to 160 hours [of mitigation investigation] prior to completing the evaluation." However, the billing records of Dr. Goodness, reflect that she performed less than[1] 42.16 hours[2] of mitigation investigation prior to the 2009 trial.   Exhibit 2:  Goodness Invoices Analyzed.

Moreover the trial attorneys had requested forensic assistance on July 1, 2008, at least a year before the June 22, 2009 opening arguments at trial.  On July 1, 2008, the "Ex Parte Motion to Appoint Forensic Psychologist to Assist in Evaluation, Preparation, and Presentation of a Defense" had been filed.  (CR 1:129).  Yet, of the 42.16 hours (units) that contain the descriptor, mitigation investigation by Dr. Goodness,  37 hours of investigation were conducted in March and April 2009 – only two months prior to the June, 22, 2009 trial. (RR Vol 36).

---

[1]    Although an invoice might bill 4 hours, the "Description" in the worksheets frequently lump together "mitigation investigation," with other activities such as expert consultation and attorney consultation.  Thus, not all of that time is actual mitigation investigation.

[2]    The worksheets appended to  the invoices of Kelly Goodness, Ph.D., obtained from the Dallas County Auditors Office, records time in "units."  It appears that a "unit" is one hour, broken into 10ths of an hour (.1 =  6 minutes).

6

The breakdown of pertinent time and tasks in the worksheets of Dr. Goodness is as follows:

| Invoice Date | Invoice Number | Attorney Consultation Units | Court Appearance Units | Case Management Units | Mitigation Units | Psych Eval Units | Record Review Units |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 02/27/2009 | 02-15278 | 2.1 | | 1.75 | 1 | 5 | |
| 03/05/2009 | 02-15287 | 4.5 | | 12 | 21 | | 2 |
| 04/30/2009 | 02-15492 | 4.83 | | 5.25 | 16 | | 3.5 |
| 05/31/2009 | 02-15567 | 3.18 | | 1.45 | 2.16 | | |
| 06/30/2009 | 02-15633 | 81.5 | | | 2 | | |
| 06/30/2009 | 02-15683 | 1.83 | 34 | | | 4 | |
| 06/30/2009 | 02-15708 | | 8 | | | | |
| 07/01/2009 | 02-15722 | | 8 | 3 | | | |
| TOTAL UNITS | | 97.94 | 50 | 23.45 | 42.16 | 9 | 5.5 |

Exhibit 2:  Goodness Invoices Analyzed.

Before an investigator or expert can be paid by the Dallas County Auditor's Office, the attorney who requested the ancillary services must sign the pay request form submitted by the expert/investigator; otherwise the expert or investigator will not be paid.  Robbie McClung or Richard Franklin signed the Request for Payment forms for Dr. Goodness.  Exhibit 2:  Goodness Invoices Analyzed.

**3.     The Collateral Interview List shows the interviews were confined to the maternal side of the family**

As part of her work product, Dr. Goodness prepared a Collateral Interview List.  Exhibit 3: Collateral Interview List.  The Collateral Interview List that shows the Goodness interviews were

confined to the maternal side (Raines) of the family: mother, two sisters, half-brother, 3 maternal uncles and 1 maternal aunt. On April 17 & 21, she interviewed, Mark Dittrich, a friend of Mark, who is not listed on the Collateral Interview List. He testified at the 2009 trial.

## B.    The Trial

### 1.    The State's 2009 Presentation

The prosecution called thirty-eight (38) witnesses (some by reading their 1991 trial testimony into the record) to testify in its case-in-chief. Although the remand to the trial court was limited to the punishment phase, the initial witnesses testified about the capital murders of Edna Brau and her grandson, Sean Hill, in the Preston Hollow area of Dallas, TX; the investigation that lead to the capture and arrest of Mr. Robertson in Las Vegas, Nevada, and his statement; events about Mr. Robertson's behavior during his transfer from Las Vegas to Dallas; and his behavior during the book-in and stay at the Dallas County Jail while awaiting trial. This was followed by witnesses who testified to extraneous-offense behaviors beginning when Mr. Robertson was 12 years old and concluded with the murder of a convenience store clerk, Jeffrey Saunders, a week prior to the murders of Brau and Hill; and about minor infractions of Mr. Robertson, during his 20 year-incarceration in TDCJ following his conviction and death sentence in the 1991 trial.

### 2.    The Defense 2009 Presentation

#### a.    In opening, the defense promised to take the jury "on a quest ... *to understand every single aspect* that led Mark Robertson from being a small boy in El Monte ... to the man who is sitting before you today"

The defense opening argument promised the jury:

... you're going to hear more in this courtroom than just the bare facts. ....  The

8

evidence is going to take you on a quest to not just understand the facts but to understand *every single aspect* that led Mark Robertson *from being a small boy in El Monte, California* to that crime scene in Preston Hollow in 1989, *to the man who is sitting before you today*. (Emphasis supplied)  (RR 36:71).

> **b.    Only three lay witnesses were called by the defense to testify.  They portrayed Mark's life in ways substantially similar to how he had been portrayed in the 1991 trial**

In the 2009 punishment phase hearing, the defense called substantially the same – but fewer (3 instead of 10) – lay witnesses as had been called to testify in the 1991 punishment phase hearing. Their testimony about Mark's life was substantially the same.

**Comparison of Mitigation Witnesses**

| Trial 1991 | | Trial 2009 | |
|---|---|---|---|
| Witness | Relationship | Witness | Relationship |
| Mary Runnels | Mother | Mary Runnels | Mother |
| | | Mark Dittrich | Friend |
| Denise McLane | Sister | Denisa Breedlove | Sister |
| | | Dr. Kristi Compton | Expert |
| | | Dr. Ari Kalechstein | Expert |
| Carol Robertson | Sister | | |
| Gary Runnels | Step-father | | |
| Laura Slushan | Family friend | | |
| Robert Raines | Uncle | | |
| Patricia Raines | Aunt | | |
| Ronnie Raines | Cousin | | |
| Lisa Tallant | Former girlfriend | | |
| Faye Carter | Neighbor | | |
| Helen Copitka | Classification expert | | |
| Dr. Crowder | | | |

> **c.    Mark was portrayed as the "favorite;" he was reared in a safe, crime-free California neighborhood**

In cross examination by the prosecution, Mary Lou testified that Donald never physically or sexually abused Mark, but instead favored Mark over the other children.  (RR 40:7).

In cross-examination, Mary Lou had also testified that Mark was reared in the 1970s in El

Monte, CA  –  a drug-free and crime-free neighborhood:

Q.     And at the time when Mark was growing up, you-all were living in a house
       outside Los Angeles in the late '70s and '80s 'til you-all moved to Plano?

A.     It was in the early '70s because I got to Plano in 1977.

Q.     And so, basically, before Plano it was all kind of outside the Colina [sic]
       area?

A.     Yes.

Q.     In El Monte, California?

A.     Yes.

Q.     And El Monte, California in the early '70s, wasn't a war zone, right?

A.     No.

Q.     You didn't have prostitutes and drug addicts living in your house or living
       on the street or anything like that?

A.     No.

(RR 40:8).

### d.     Christi Compton, Ph.D, the defense expert

### (1)     testified in a *subrosa* hearing, that she would be testifying to the "genetic and social influences, to how [Mark] arrived at where he is at and his potential mental state at the time of the offenses and his current psychological functioning"

In a *sub rosa* hearing, the testifying forensic psychologist retained by Robertson's trial

counsel, Christi Compton, Ph.D., had made two diagnoses of Mark Robertson: Anti-social

personality disorder (ASPD) and poly-substance dependence in remission in a controlled

environment.  (RR 39:209).

10

Dr. Compton stated she would be:

"providing to the jury ... *genetic and social influences*, to how he arrived at where he is at and his potential mental state at the time of the offenses and his current psychological functioning." (Emphasis supplied) (RR 39:209).

Dr. Compton testified that her diagnoses were premised on "his family history. The influences of his father. The influences of his mother. And the combined influence of both of those." (RR 39:209-210). Dr. Compton testified in arriving at her conclusions, she had:

- interviewed Mark Robertson three times for a total of 9 hours (RR 41:66);

- interviewed once, one of Robertson's two sisters (Denise Breedlove), his half-brother (Donnie), biological mother and stepfather (Mary Lou and Gary Runnels);

- reviewed medical records from four drug rehabilitation facilities (Charter Hospital, New Place, House of Hope, and Brookwood Recovery Center);

- reviewed all the extraneous offenses as a juvenile and adult, the offense reports on the three murders, the disciplinary and mental health records from TDCJ, and

- reviewed a social history provided by the attorneys (which she was not sure was generated by Dr. Goodness).

(RR 39:212, 217; RR 41:66, 67).

### (2) testified before the jury that Mark had a genetic link for ASPD because she "believed" that his father was "either a psychopath or sociopath"

Though Dr. Compton stated on cross-examination that she did not "diagnose" Donald Roberston, she said she felt comfortable telling the jury that she "believed" him to be a psychopath. (RR 41:107). Dr. Compton labeled Donald Robertson as being "either a psychopath or sociopath" because Mark, Mary Lou, Denise, and Donnie had related their experiences with him, and described Donald Robertson as being "a pretty violent, mean individual." (RR 41:72-74).

11

Dr. Compton testified that Mark had had a genetic link to anti-social personality disorder through his father, which ultimately culminated in her testimony that "at the time of the offense appellant was a sociopath, and at the time of trial he was still diagnosed with anti-social personality disorder, for which there is neither cure nor treatment." *Robertson v. State*, AP-71,224, 2011 WL 1161381, at *1-2 (Tex. Crim. App. Mar. 9, 2011) (not designated for pub.).   Dr. Compton also diagnosed Mark Roberston with a secondary diagnosis of poly-substance dependence ("means he was using lots of drugs") at the time of the offense in 1989.  (RR 41:69).

### (3)     suggested to the jury that Mark had RAD

Dr. Compton testified that there were "a series of abandonments," including:

- his mother abandoning him at age 7 to move in with Gary Runnels, (RR 41:77);

- his father who threw him out of the house; (RR 41:77);

- his sister leaving the Runnels house when Mark was eleven; (RR 41:77); and

- the death of Penny the counselor at New Place in Richardson, TX. (RR 41:78).

Dr. Compton testified that "from the age of three to approximately six, seven, eight ... [these ages] are the most important formative years for personality development" and that abandonment by his mother and favoritism by his father would have affected Mark's personality development.   (RR 41:82-83).

According to Dr. Compton, anger, aggression, emotion blocking, mistrust of others, a reduced ability to show empathy and bond and connect with others is a result of abandonment and witnessing abuse.  (RR 41:83).  She also discussed Reactive Attachment Disorder (RAD), which can show in children in one of two ways: by acting out and becoming aggressive, or instead becoming

very needy toward people.  (RR 41:80-81).  Dr. Compton's testimony suggested to the jury that

Mark had RAD.

**REASONS TO ISSUE THE WRIT OF HABEAS CORPUS**

Petitioner's conviction and death sentence were obtained in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution.  U.S. Const. amend. VI; U.S. Const. amend. VIII; U.S. Const. amend. XIV.

Set out below are the grounds that warrant the issuance of the writ of habeas corpus.  All factual and legal allegations presented in any claim in this petition are fully incorporated into each and every other claim in this petition.

**GROUND ONE (IAC &** *Wiggins* **–** FAILURE TO ADEQUATELY INVESTIGATE & DEVELOP MITIGATING EVIDENCE)**:  Mr. Robertson  was denied his federal 6th and 14th amendment rights to effective assistance of counsel, who unreasonably narrowed the scope of, and prematurely ceased, the investigation despite red flags that signaled further investigation needed to be done into Mark's mental state at the time of the offense, into maternal and paternal genetic-and-environmental influences, and into Mark's early childhood**

A.   **Standard of Care: The prevailing standard of care mandated a thorough and adequate investigation into the psychosocial history of Mr. Robertson**

There can be no doubt that under the prevailing standard of care at the time of Mr. Robertson's 2009 trial, counsel had a clear and unequivocal duty to conduct a thorough social history investigation.  Yet counsel unreasonably narrowed the scope of, and prematurely terminated, the investigation despite red flags that signaled further investigation needed to be done into Mark's mental state at the time of the offense, into maternal and paternal genetic-and-environmental influences, and into Mark's early childhood.

There is well-settled authorities from TCCA opinions[3] to U.S. Supreme Court cases, and Texas and ABA Guidelines, that hold that trial counsel has a duty to conduct a comprehensive inquiry into the client's life and background when preparing to defend a capital case.  In *Wiggins v. Smith,* a case that was tried in 1989, the Court found that trial counsel's performance was deficient because counsel failed to investigate a plethora of mitigating evidence that was available at the time of trial.  *Wiggins v. Smith,* 539 U. S. 510 (2003).   The Supreme Court's stated:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long

---

[3]    *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) (Judge Cochran wrote a concurring opinion in *Gonzales* further clarifying the applicable professional norms.  "[D]efense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty."). *Id.* at 400.

have referred as 'guides to determining what is reasonable.' *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495. ***The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'*** ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1( c), p. 93 (1989) (emphasis added).   Despite these well-defined norms, however, ***counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources***. Cf. *id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, ***family and social history,*** prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added);  1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing....  Investigation is essential to fulfillment of these functions').

539 U.S. at 524-525 (emphasis supplied). *See also Porter v. McCollum*, 130 S.Ct. 447, 452 (2009) ("It is unquestioned that under the prevailing professional norms [in 1988], counsel had an obligation to conduct a thorough investigation of the defendant's background" (internal quotations omitted)); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) ((holding that counsel's failure to introduce mitigating evidence not justified by a tactical decision to focus on Williams's voluntary confession because the decision was not informed by a thorough investigation of the defendant's background).

*See also* Texas Guidelines 11.1 and 11.7 (April 21, 2006 ed.); ABA Guidelines 10.7 and 10.11 (rev. ed. Feb. 2003).

Viewing the work of Mr. Robertson's 2009 defense team through this lens, it is plain that his counsel prematurely ceased investigating Mark's psychosocial history when, like Mr. Wiggins' attorneys, they "acquired only rudimentary knowledge of his history from a narrow set of sources."

Mr. Robertson was prejudiced because without an adequate and thorough psycho-social history investigation it was not possible for the testifying mental health expert, Dr. Compton, to have "provid[ed] to the jury ... ***genetic and social influences***, to how he arrived at where he is at and his

16

potential mental state at the time of the offenses and his current psychological functioning." (Emphasis supplied)  (RR 39:209).  She simply did not have the necessary factual foundation to do so.  As a result, Dr. Compton prematurely labeled Mark Robertson as an incurable sociopath, and suggested to the jury that Mark suffered from RAD.

For the same reason, it was not possible for the defense to fulfill its promise that they would take the jury "on a quest ....  to understand *every single aspect* that led Mark Robertson ... to [be] the man ... before you today."  (RR 39:209-210).   The defense attorneys could not tell the jury who Mark was or explain what propelled him to commit the offense conduct, when the defense lawyers themselves did not have adequate and necessary facts about Mark's psychosocial history.

B.      **Deficient Performance**

     1.      **Trial counsel prematurely ceased investigation, despite red flags signaling more investigation needed to be done into maternal-and-paternal genetic-and-environmental influences, and into Mark's early childhood**

One of the objectives in the "Professional Objectives" section in the Curriculum Vita of Dr. Goodness, (Exhibit 1A) was to "provide *comprehensive* mitigation, ... services," (CR 1:132). The billing records of Dr. Goodness demonstrate that she fell woefully short. She conducted only 42.16 hours of mitigation investigation, (Exhibit 2), despite the condition in the Engagement Contract that the defense attorneys could expect that she would "put in 120 to 160 hours" of mitigation investigation before completing her evaluation of the client. (Exhibit 1B).

The Dallas County payment system requires that defense attorneys sign the pay request forms submitted by the expert or investigator; otherwise, the auditor's office will not paid for their ancillary services. Robbie McClung or Richard Franklin signed the Request for Payment forms submitted by Dr. Goodness. Exhibit 2: Goodness Invoices Analyzed. Thus, defense counsel knew or should have known how much time and what tasks Dr. Goodness undertook in the *Robertson* case.

The Collateral Interview List (Exhibit 3) further demonstrates that Dr. Goodness did not conduct an adequate and reasonable psychosocial history of Mr. Robertson. The trial attorneys did not direct her to do more. The Collateral Interview List, *infra*, is broken down into three sections:

    •      Collateral Interviews Completed

    •      Collateral Interviews Attempted

    •      Collaterals Still Needed  – Private Investigator to Find

18

**Collateral Interview List**

**The State of Texas vs. Mark Robertson**

---

**Collateral Interviews Completed:**
Mary Runnels, the defendant's mother – 3/16/2009
Gary Runnels, the defendant's stepfather – 3/16/2009
Denise Broadlove, the defendant's sister – 3/16/2009
Carol Carpenter, the defendant's sister – 3/16/2009
James "Jimmy" Raines, the defendant's brother – 3/16/2009
Edna Fletcher, the defendant's aunt – 4/2/2009
Raymond Raines, the defendant's uncle – 4/2/2009
Joe Raines, the defendant's uncle – 4/2/2009
Bob Raines, the defendant's uncle – 4/3/2009

**Collaterals Interviews Attempted:**
Ronnie Raines, the defendant's cousin – left message on 4/2/2009
Beverly and Eddie Bionne – left message on 4/2/2009

**Collaterals Still Needed – PRIVATE INVESTIGATOR to find:**
Beverly Raines, maternal cousin (daughter of Bob Raines)
Roger Raines, maternal cousin (son of Raymond Raines)
Sherry Raines, maternal cousin (daughter of Raymond Raines)
Pam Fletcher, maternal cousin (daughter of Edna Fletcher)
Bruce Robertson, paternal uncle – last known to be in CA
Wesley Robertson, paternal cousin (son of Bruce Robertson) – last known to be in CA or OR
Bruce Robertson, Jr., paternal cousin (son of Bruce Robertson) – last known to be in CA
Jimmy Robertson, paternal cousin (son of Bruce Robertson) – last known to be in CA or OR
William Robertson, paternal uncle – last known to be in CA

    **a.**    ***Missing Significant Paternal Information***:   **Other than anecdotal information from the immediate family that Mark's biological father was "a pretty violent, mean individual," the records show that the defense team had _no_ actual communication with the paternal side of the family prior to the 2009 trial**

A review of the "Collateral Interviews Completed," entry sent up flags that Dr. Goodness had interviewed only the maternal side of the family (the Raines family members): 5 members of the immediate family (mother, two sisters, half-brother), 3 maternal uncles and 1 maternal aunt. None of the named individuals were from the paternal line, such as Mark's father or paternal uncles or other paternal relatives.

A review of the "Collaterals Still Needed – Private Investigator to find" entry shows that 9 individuals (4 maternal cousins; 4 paternal cousins, and one paternal uncle) still had to be found and interviewed. Other than cryptic entries[4] within the billing records of the investigator, Mr. Hunt, the record is silent that any of these individuals were ever located, or the extent to which attempts if any, had been made to locate them. Exhibit 4: Hunt, Private Investigator, billing records.

The defense counsel knew or should have known, just from a facial review of the Collateral Interview List, that what knowledge they had about Mark's paternal history was rudimentary and

---

    [4]    There are cryptic entries within the Private Investigator Hunt billing records that show that about a month before the trial, there was some attempt to locate family members. However, other than naming Mark's father, Donald Robertson, it is unclear who they were. Further, these entries were bunched with other investigative tasks within the same date line; thus, the total amount of time (2, 4, 4, 3 hours) is not reflective of what time had actually been spent on family background investigation, or paternal investigation in particular. (Exhibit 4).

The applicable entries were:

| | | |
|---|---|---|
| 3/20/09 | "Def.'s Family Background | 2.00 |
| 5/20/09 | "Background/Def's Family," | 4.00 |
| 5/27/09 | "Donald James Robertson DOB 5/4/1936" | 4.00 |
| 6/3/09 | "Other Family Members" | 3.00 |

from a narrow set of sources.  It was information of an anecdotal nature from Mary Lou, Denise, Carol, and Donnie, that Donald Robertson was "a pretty violent, mean individual." (RR 41:72-74). Other than that, there was no investigation into Donald Robertson's psycho-social history, the environment and family into which Donald Robertson had been born, or his mental and physical health.  Such investigation could have revealed that the behavior of Donald Robertson was because of reasons other than that he was a psychopath.

        **b.**     ***Missing Significant Maternal Information*: The records of the defense team reflect <u>no</u> reasonable investigation into Mark's birth and early developmental years; or the psychological, emotional, and physical health of his maternal caretaker(s) from Mark's birth to age 5, to reflect her ability to comfort and nurture Mark; this type of information is critical to support or refute Reactive Attachment Disorder (RAD)**

There is a substantial gap in information from Mark's birth through early childhood in the records.  For example, the Charter Hospital records from Mark's drug rehabilitation treatment reflect that Mark's mother had reported that he had been breast and bottle fed and weaned at about 12 months of age.  He began walking at ten months and talking at 12-14 months of age.  He was toilet trained at 12-14 months by his mother.  His mother also reported that he had an usual imagination when a child.  Charter Hospital, Psychological Assessment by Peggy Malone, ACSW, CSW-ACP. Mary Lou had  testified in the 2009 trial that it was a "happy day" when Mark was born following a full-term pregnancy. (RR 39:139).  While these records capture Mark's physical development, they do not show any inquiry into Mark's attachment to a caretaker, and the physical and mental health of that caretaker and her ability to nurture him in infancy.

Dr. Goodness' records too are silent about the attachment between Mark and his mother from birth to age 5, or any other significant caretaker.  Goodness' records are silent about Mary Lou's

mental, physical and emotional health to refute or support her ability to have provided comfort and to have nurtured her youngest son from birth to age 5.   The records do not indicate that the trial attorneys directed Dr. Goodness to conduct further investigation to close this gap, or that anyone from the defense team did so.

Factual knowledge about attachment with a caretaker from birth to age 5 is the critical foundation before a professional can opine on Reactive Attachment Disorder (RAD).   This is because "***Reactive attachment disorder is rare. .... Reactive attachment disorder begins <u>before age 5</u>, usually starting in infancy*** ."   (Emphasis supplied)   Exhibit 9:  Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011)

http://www.mayoclinic.com/health/reactive-attachment-disorder/DS00988

The Mayo Clinic definition of RAD is:

Reactive attachment disorder ***is a rare*** but serious ***condition*** in which infants and young children don't establish healthy bonds with parents or caregivers.

A child with reactive attachment disorder is typically neglected, abused or orphaned. Reactive attachment disorder develops because the child's basic needs for comfort, affection and nurturing aren't met and loving, caring attachments with others ***are never established***. This may permanently change the child's growing brain, hurting the ability to establish future relationships.

(Emphasis supplied)   Exhibit 9:  Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011)

http://www.mayoclinic.com/health/reactive-attachment-disorder/DS00988


According to literature from the Mayo Clinic:

Signs and symptoms [of RAD] in babies may include:
•     Withdrawn, sad and listless appearance
•     Failure to smile
•     Lack of the normal tendency to follow others in the room with the eyes
•     Failure to reach out when picked up
•     No interest in playing peekaboo or other interactive games

22

- •  No interest in playing with toys
- •  Engaging in self-soothing behavior, such as rocking or self-stroking
- •  Calm when left alone

Exhibit 9:  Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011).

The information in the *Robertson* records sent up red flags that further inquiry needed to be done into Mark's birth to age 5, his attachment to his mother or other caretaker, and the caretaker's ability and willingness to nurture Mark in infancy, before any reliable and valid suggestion by Dr. Compton could be made to a jury that Mark suffered from RAD.  (RR 41:80-81).

c.    *Missing Early Childhood Years*:  **The Records Review #1 List reflects little to no information about Mark's early childhood in California**

Other than mere rudimentary information, the Records Review #1 created by Dr. Goodness is devoid of adequate information about the environmental influences on Mark during his childhood in California.  For example, there is little to no information about those neighborhoods in which the Robertson family had lived in California, such as El Monte, Linwood, and Monrovia, or interviews of teachers, neighbors, and friends, who could speak to the family dynamic during Mark's early youth in California.[5]  The trial lawyers knew or should have known that environmental influences

_____

[5]    There are cryptic entries within the Private Investigator Hunt billing records that show three entries referring to California and Louisiana locations.  These entries were bunched with other investigative tasks within the same date line; thus, the total amount of time is not reflective of actual time spent investigating. (Exhibit 4).

The applicable entries were:

| | | |
|---|---|---|
| 3/30/09 | Other Info/School Records/El Monte, CA/Plano Sch District | 1.00 |
| 4/09 | Def. Passed Sch. Records/California | 7.00 |
| 5/05/09 | History/Elmonte, CA/Lynwood CA/Shreveport LA | 3:00 |

are crucial to developing an accurate picture of who Mark Robertson is.

In cross-examination at the 2009 trial, the prosecutor lead Mary Lou into portraying El

Monte as a safe, crime-free neighborhood:

> Q.     And at the time when mark was growing up, you-all were living in a house
>        outside Los Angeles in the late '70s and '80s 'til you-all moved to Plano?
>
> A.     It was in the early '70s because I got to Plano in 1977.
>
> Q.     And so, basically, before Plano it was all kind of outside the Colina area?
>
> A.     Yes.
>
> Q.     In El Monte, California?
>
> A.     Yes.
>
> Q.     And El Monte, California in the early '70s, was wasn't a war zone, right?
>
> A.     No.
>
> Q.     You didn't have prostitutes and drug addicts living in your house or living
>        on the street or anything like that?
>
> A.     No.

(RR 40:8).

In contrast, on May 3, 2009 the Los Angeles Times had published an article (prior to the

June 22, 2009 jury trial), which reported that in the 1970s[6]:

> *El Monte, with a population of 126,000, never had it easy. In 1971, a national*
> *magazine described the city as a "blur of suburban sprawl." Most of the citizens*
> *were "unskilled or semi-skilled workers from the South and the Midwest."* But the
> Mexican and Mexican American community was growing fast, with many leaving
> the barrios of East L.A.
>
> In the 1950s and '60s, the still mostly white city was a hangout for country music

---

[6]     Mark had attended Shirpster Elementary School located in El Monte, California in 1973,
1974, 1975, 1976, and 1977.

24

fans, with clubs like the Nashville West. In the late 1960s, the American Nazi Party opened a headquarters on Peck Road, which caused regular demonstrations. A leader of the group was later killed in front of the offices after an argument with other party members.

*"El Monte had a fighting reputation," Councilwoman Patricia Wallach said. "It was a kind of rough and tumble town."*

At one time, it also had a main street that boasted the kind of department stores that gave the town the appearance of middle class. But it would never quite achieve that status, unlike neighboring Temple City, Arcadia and Rosemead and nearby West Covina.

"It was a neat little town, a real nice little town. Working class," said Janice Wiggins, 71, who has lived in El Monte since 1948.

*By the 1970s, El Monte's white population was in flight and the city became a hub for immigrants from Latin America. The city's population exploded while its median household income declined. Crime remained a big problem, along with graffiti and general urban blight. Many of the mainstream retailers left, including stores like J.C. Penney.*

Exhibit 6:  Hector Becerra, LOS ANGELES TIMES, *El Monte is Down on Its Luck* (May 3, 2009).


   2.     **Trial counsel had only a rudimentary knowledge, and prematurely terminated the investigation, before having an adequate understanding of the mental state underlying the behaviors of Mark Robertson**

      a.     *The Circle Tallant Stressor*:  **Despite the red flags about the Circle Tallant Stressor, the defense team did not investigate its significance, or the correlation between the date of the termination of the live-in-relationship and Circle's  abortion of Mark's child, and the date of the offense conduct**

The Records Review #1 List (Exhibit 5) prepared by Dr. Goodness reflects that the defense team had access to the 1991 trial transcripts.  Following the Table of Contents of this list are transcripts summaries of the testimony of 13 witnesses, including the testimony of Circle Lisa Tallant.

Tallant's testimony captures the dates of the relationship between her and Mark. They had been living together.  It also  graphically portrayed the emotional devastation experienced by Mark when Circle Tallant ended her relationship with Mark, and worse, when she aborted their child:  "It tore him up." (1991 RR 64:105, 111).  At the 1991 trial, Circle had testified:

A.      .... We talked about it and I just couldn't go through with having a baby.

Q.      What affect did that have on Mark?

A.      ***It tore him up.***

Q.      How many times do you think you talked to him in the next three or four weeks about it?

A.      ***He called me a hundred times a day, you, trying to find out what had happened and was I still pregnant, was I going to keep the baby***.

Q.      Did he make offers to you about what he would do for you if you kept the baby?

A.      Yes.  He wanted to get married and he wanted to have a family.  He said that I didn't have to do anything.  He would take care of the baby if I kept the baby.

Q.      Did you go through with the abortion?

A.      Yes, I did.

Q.      And you let him know that you had done that; is that correct?

A.      Yes, I did, but I told him that I had done it sooner than when I did it.  I stayed pregnant for almost three months because I didn't want to let go of the baby.

(1991 RR 64:107).

Yet, Mr. Robertson's attorneys did not direct Dr. Goodness to interview Circle Tallant.  *See* Collateral Interview List (Exhibit 3) (Circle Tallant is not listed among persons interviewed or to be interviewed).  The records do not indicate that anyone from the defense team interviewed her, despite the fact that her 1991 trial testimony sent up red flags that further investigation needed to

26

be conducted into the Circle Tallant Stressor and its correlation to the offense conduct.

A chronology of events makes it apparent that in the weeks before the offense conduct, Mark had experienced the most traumatic stressor of his life:  Circle Lisa Tallant ended her live-in relationship of six to seven months with Mark.  She told Mark that she had aborted their child. (hereinafter "Circle Tallant Stressor").  Mark totally spiraled out of control.

The chronology of events unfolded thus:

| | |
|---|---|
| January 1989 | Mark and Circle Tallant move in together in January. (1991 RR 64:103) |
| June 1989 | The relationship lasted 6-7 months. (1991 RR 64:104). Circle ends the relationship after she returned from vacation at the end of May. She tells Mark of the abortion even before she had it. (1991 RR 64:104-105, 107) |
| July 1989 | Mark and Circle speak daily about Mark's desire to marry her and raise the baby. |
| August, 1989 | Mark called Circle one last time a couple of days before his arrest.  She moved to Corpus Christi. (1991 RR 64:108) |
| August 19, 1989 | Date of offense conduct (1991 CR 102 - indictment) |

At least four years before the trial, there was readily accessible information within the mental health community that "[s]tress affects cognitive abilities, including the ability to weigh costs and benefits and to override impulses with rational thought."  Amicus Brief of AMA, APA, *et al.* filed with the U.S. Supreme Court in  *Roper v. Simmons*, 543 U.S. 551 (2005).  Studies "suggest that violence ...  stems from multiple overlapping factors interacting in complex ways. These include family history, ***personal stressors*** (such as divorce or bereavement), and socioeconomic factors (such as poverty and homelessness). ...."  (Emphasis supplied) *See* Exhibit 7:  *Mental Illness and*

27

*Violence:  Multiple Interacting Factors Contribute to Violent Behavior*, Harvard Health Publications, Harvard Medical School.[7]

In an adult, it can take one to two years on average for a person to spring back from a traumatic event.  Research into resiliency after a traumatic event(s) "has been investigated in adults, and the emerging picture suggests that resilience is comprised of a host of factors. Researcher George Bonanno, Ph.D. has found, for example, that ***after a traumatic stressor, adults experience a dip in psychological and physical functioning which lasts for several months, but that on average***, adults return to pre-trauma levels of functioning ***approximately one to two years later***.  However, the return to previous functioning can take longer depending on the nature of the event, the support the individual has, and the attitudes and beliefs the individual holds."  Exhibit 8:  New York University Child Study Center, *Children's Resilience in the Face of Trauma* (July 9, 2010).  http://www.education.com/reference/article/Ref_Childrens_Resilience/

Mark was not an average person because of his long-history of continuous and severe childhood abuse, deprivation, and neglect.  Knowledge of the traumatic stressors that impinged on Mark prior to the offense conduct, and how it affected his behavior would have been a crucial component in determining how the defense would address the future dangerousness special issue.  It was not investigated despite the red flags.

---

[7]

http://www.health.harvard.edu/newsletters/Harvard_Mental_Health_Letter/2011/January/mental-illness-and-violence

b.      ___Mental illness___: **Despite having reviewed records that sent up red flags, the defense team did no investigation into whether Mark suffered from a treatable mental illness, whose symptoms are substantially similar to ASPD**

The Records Review #1 List (Exhibit 5) prepared by Dr. Goodness reflects that the defense team had access to the 1991 trial transcripts.  Following the Table of Contents of this list are transcripts summaries of the testimony of 13 witnesses.  The testimony of Paul Mills, found in Volume 64, of the 1991 trial transcript, is not included in the summaries.

Paul Mills had testified that he had been Mark's adult probation officer with  Collin County, TX. (1991 RR 64:111-112).  At the time that Mr. Mills was supervising Mark Robertson, he thought that Mark could be suffering from bipolar disorder, and that Mark should be tested:

Q.      And do *you also recall telling them that you had hoped to get him tested for a lithium deficiency because you had had success in the past with treating people who might have a blood deficiency* causing the drug addiction?

A.      Not causing drug addiction, but causing manic type behavior.  To answer your question, I did believe that that came up and that I might well have said something to that effect.

(1991 RR 64:151).

The 2009 trial testimony of Mary Lou Runnels corroborates the 1991 testimony of Mr. Mills:

A.      The only time I remember Mr. Meeks talking to us is when he called our house when all these murders happened and said he wished he could have got ahold of Mark, because *he knew that Mark was missing a drug in his system: Lithium.  And he wished he could have found Mark before he did all of that*.

Q.      He felt like there was some sort of chemical imbalance in Mark –

A.      Yes.

Q.      How did that make you feel, *someone telling you kind of after the fact that there might have been a magic pill that could have altered all of* this?

29

A.     Why hadn't they found that when he was in all the drug rehab we had him at? Why didn't they find it then?

(Emphasis supplied)  (RR 39:190).

The Records Review #1 List (Exhibit 5) reflects that the defense team had also reviewed the medical records from Charter Hospital of Dallas.  These treatment records reflected that Mark had significant tendencies toward high energy and impulsiveness, and to behave without considering the consequences.  Lifemark-Brookwood Recovery Center –  Psychological Evaluation by Richard Krummenl, Ph.D. 5-24-1984.  Other treatment records reflect that Mark had overdosed on over-the-counter Dexatrim (a diet aid), which was characterized as a suicide gesture.  Charter Hospital of Dallas Records, July to August 1998.

Yet, neither Paul Mills nor Mr. Meeks are listed on the Collateral Interview List (Exhibit 3) as someone that the defense attorneys had directed Dr. Goodness to interview, or even attempted to interview.  The records do not indicate that anyone from the defense team interviewed them either.  The Collateral Interview Summary of Mary Lou Runnels, dated March 16, 2009, does not show that the defense team discussed Mark's possible chemical imbalance with Mary Lou at all.

The 1991 trial testimony, the Charter Hospital Records, and even the 2009 trial testimony from Mark's mother, sent up red flags that defense counsel had only a rudimentary knowledge about Mark's mental health history, yet they did nothing to investigate into whether Mark may have suffered from a serious but treatable mental illness, such as bipolar disorder.

Bipolar disorder shares many of the same symptoms as Anti-Social Personality Disorder (ASPD), which is not treatable.  For example,

*Early Age of Onset*:    Mark's trouble with the law began at age 12. Conduct disorder, the precursor to ASPD, manifests prior to age 15.   However, bi-polar disorder too can manifest in

30

childhood.  "Until recently, lithium was the only drug approved for treating bipolar disorder in children (age 12 years and older). A few atypical antipsychotic drugs, such as risperidone (Risperdal) and ariprazole (Abilify), are approved for children ages 10 - 17 with bipolar I disorder." *See* University of Maryland Medical Center, Bipolar Disorder.[8]

*Genetic Link*:  Like ASPD that has a genetic link, "[b]i-polar disorder frequently occurs within families. Family members of patients with bipolar disorder are also more likely to have other psychiatric disorders. They include schizophrenia, schizoaffective disorder, anxiety disorders, ADHD, and major depression." *Id*.

*Substance Abuse*:  Like ASPD, "[s]ubstance abuse is very common among people with bipolar disorder, ...."  National Institute Of Mental Health, Bipolar Disorder[9]

*Impaired Judgment and Violence*:  Like ASPD, persons suffering from bipolar disorder have impaired judgment and engage in harmful behaviors.  "A small percentage of bipolar disorder patients demonstrate heightened productivity or creativity during manic phases. More often, however, the distorted thinking and impaired judgment that are characteristic of manic episodes can lead to dangerous behavior including:

- •  Spending money with reckless abandon, causing financial ruin in some cases

- •  Angry, paranoid, and even violent behaviors

- •  Openly promiscuous behavior," *Id.*

In summary, at least a year before the trial, (July 1, 2008), defense counsel knew that "to adequately prepare a defense in this case, he ***is required to investigate <u>any and all</u> mitigating***

---

[8]    http://umm.edu/health/medical/reports/articles/bipolar-disorder

[9]    http://www.nimh.nih.gov/health/publications/bipolar-disorder/index.shtml

31

*factors regarding the Defendant*.  *Williams v. Taylor*, 529 U.S. 362 (U.S. Sup. Ct. 2006), ....)".

(Emphasis supplied) (CR 1:129-146).  Yet, as of the opening arguments on June 22, 2009,  trial

counsel had only a rudimentary knowledge about Mark's maternal and paternal genetic and

environmental influences, his early childhood, and his mental health.  The knowledge that they did

have sent up red flags to investigate further, but they did not.  Instead trial counsel unreasonably

narrowed the scope of, and prematurely terminated, the investigation into Mark's psycho-social

history.


C.      **Prejudice**

In *Strickland v. Washington*, the Supreme Court set out the following framework for

analyzing the prejudice component of a claim of ineffective assistance of trial counsel:

> In making this determination, a court hearing an ineffectiveness claim must consider
> the totality of the evidence before the judge or jury.  Some of the factual findings
> will have been unaffected by the errors, and factual findings that were affected will
> have been affected in different ways.  Some errors will have had a pervasive effect
> on the inferences to be drawn from the evidence, altering the entire evidentiary
> picture, and some will have had an isolated, trivial effect. Moreover, a verdict or
> conclusion only weakly supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. ***Taking the unaffected
> findings as a given, and taking due account of the effect of the errors on the
> remaining findings, a court making the prejudice inquiry must ask if the defendant
> has met the burden of showing that the decision reached would reasonably likely
> have been different absent the errors***.

*Strickland*, 466 U.S. at 695-96.

Based on information and belief, an adequate and reasonable investigation into Mark's

psycho-social history would have revealed that Mark suffered substantial abuse at the hands of his

biological father, as well as deprivation and neglect throughout childhood from all of his parental

figures.  In addition, he may have suffered from an untreated, but treatable, mental illness.  Further,

a chronology reflects that Mark experienced one of the most significant of traumatic stressors of his life, the Circle Tallant Stressor, which adversely affected his cognitive abilities, including the ability to weigh costs and benefits and to override impulses with rational thought.  Mark spiraled out of control in the weeks immediately preceding, and culminated in, the murders of Saunders, Brau and Hill.  Had the jury known the real Mark Robertson, they would not have sentenced him to death.

Because the psychosocial history of Mark Robertson was not adequate or reasonable, the lay-and-expert-witness testimony had an unfair and prejudicial impact on the jurors determinations on the Special Issues, particularly as to future dangerousness.  For example, Dr. Compton testified that in formulating her diagnoses of Mark, she had relied, among other things, on a social history provided by the attorneys.  (RR 39:212, 217; RR 41:66, 67).

Yet, upon information and belief, Dr. Compton did _not_ have adequate information about

- Donald Robertson's psycho-social history, the environment and family into which Donald Robertson had been born, and his mental and physical health, from paternal family members;

- attachment signs and symptoms (or lack thereof) of Mark from birth through age 5;

- the California neighborhoods in which the Robertson family had lived (El Monte, Linwood, and Monrovia),

- the family dynamic during Mark's early youth in California from interviews of teachers, neighbors, and friends, who interacted with Mark and his family in California at that time;

- whether Mark suffered from a curable mental illness, such as bipolar disorder; and

- the traumatic stressors that impinged on Mark, such as the Circle Tallant Stressor and more particularly the dates of it in relation to the offense conduct.

33

Without an adequate factual foundation, Dr. Compton's opinion that Mark had inherited a genetic link to ASPD from Donald Robertson, and thus, Mark was an incurable sociopath,[10] was not valid or reliable.  Similarly, Dr. Compton's suggestion to the jury that Mark had RAD is equally suspect because the mitigation investigation did not inquire into Mark's attachment to his caretaker from birth to age 5.  *See* Exhibit 9:  Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011).

Without an adequate investigation into Mark's psychosocial history, despite the red flags that signaled more investigation was needed, the trial attorneys could <u>not</u> strategically make choices in what to present to the jury to explain to them what "led Mark Robertson from being a small boy in El Monte, California to that crime scene in Preston Hollow in 1989, to the man who is sitting before you today." (Emphasis supplied)  (RR 36:71). *See  Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"). *See also*  ABA GUIDELINE 10.7[11]

In summary, trial counsel was constitutionally ineffective.  Habeas relief should be granted.

---

[10]    *See  Robertson v. State*, AP-71,224, 2011 WL 1161381, at *1-2 (Tex. Crim. App. Mar. 9, 2011) (not designated for pub.) ("Appellant's psychologist, Dr. Compton, testified that at the time of the offense appellant was a sociopath, and at the time of trial he was still diagnosed with anti-social personality disorder, for which there is neither cure nor treatment.").

[11]    GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. Feb. 2003), ABA GUIDELINE 10.7  – Investigation, *Commentary*, p. 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation fo first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations").

**GROUND TWO (MATERIALLY INACCURATE EVIDENCE – 5TH, 6TH, 8TH, 14TH AMENDMENTS): Mr. Robertson  was denied his federal 5th, 6th, 8th, and 14th amendment rights because his death sentence was based on materially inaccurate evidence from Warden Kelly**

A.      **Statement of Facts**

1.      **Trial Testimony of Warden Nelson**

In the 2009 punishment phase re-trial of Mark Robertson, Warden Nelson testified before the jury that an inmate convicted of capital murder who received a life-sentence is classified as a G3. She further testified that once that inmate serves at least ten years and maintained a clear disciplinary record, he is "automatically" reclassified as a G2, which gives him substantial freedom to work within and without the fenced perimeters of the prison:

> Q.      Okay.  Now, Warden, you talked about someone coming in off the streets convicted of capital murder and getting a life sentence, they go in   – they will be classified as a G3, is that correct?
>
> A.      Yes, sir.
>
> ....
>
> Q.      Okay and the sentence for someone with a G3 status, again is someone who is serving a capital murder life sentence or any other individual committing any other felony offense wherein they received a sentence of 50 years or greater, is classified as a G3 from the start?
>
> A.      Yes, sir. From the start.
>
> Q.      Is there a point in time that they can move to a less restrictive area?
>
> A.      Ten years.
>
> ....
>
> A.      If they have maintained, or have maintained for the last year, a clear disciplinary history at the ten-year mark, they will be automatically considered – automatically promoted to a G2 status.  It's an automatic promotion.

....

Q.     So, in this case, where Mark Robertson  – if he were to get a life sentence
       from this jury  –  they know he's been on death row for eighteen years, and
       they've heard his record.  You've reviewed the record.  Someone with that
       record, would he be in that pool that would automatically be in the G2 status,
       they were to get a life sentence?

A.     Yes.

Q.     And the G2 status that you mentioned to me, that is less restrictive than G3,
       in that the housing arrangements and where they can work within a unit; is
       that correct?

A.     Yes.  (RR 42:113-115).

## 2.     Prosecutor's Closing Arguments and the Jury Notes

The prosecutor's closing argument emphasized Warden Nelson's testimony:

....  He is a sociopath.  He will always be a sociopath.  You put him in general
population, minimum security, he will continue to be a sociopath. (RR 43:11). ....

....  Well, you know from the warden, he['s] not gone [sic] be locked down anymore,
if you give him a life sentence.  (RR 43:23). ....

During jury deliberation, the jury sent out several jury notes.  As to their future

dangerousness deliberations, those notes reflect in particular:

**Jury Note No. 1**

If question 2 [future dangerousness special issue] is not unanimously yes and we do
not have 10 no's what is the disposition? (CR 1:200)

**Jury Note No. 2**

36

If Mark Robertson is given a life sentence, given his 18 years incarceration would he enter as G2 or G3?  If not, at what level would he enter and how long before he might achieve a G2 status? (CR 1:202)

**Jury Note No. 3**

We would like to understand the date of Mark Robertson's six prison infractions. (CR 1:205).

Based on the jury's answers to the special issues, Mr. Robertson was sentenced to death. (CR 1:210).

### 3.        The Motion for New Trial

At the beginning of the hearing on a Motion for New Trial, Lisa Smith, an Assistant Dallas District Attorney, told the court:

ADA:        Judge, we just wanted to document for the record some information that we received last week and that we turned over to Defense counsel this morning.

Last wee, we discovered in the course of the prosecution of another death penalty case that our witness, ***Warden Nelson, had given some testimony in the Juan Lizcano trial that was inaccurate.  The testimony related to whether or not a capital murderer who got a life-without-parole sentence could ever be eligible for custody status of G2.  She said they could, but she was wrong***. She learned – and we learned  – after that trial that it was an addendum to the classification plan when the LWPO law was passed.  So that capital murderers who get life without parole can never be in a custody level less than G3  – less restrictive than a G3.

That does not apply to Robertson.  He's not an LWOP.[12]  However,

_____

[12]        Approximately three (3) months after the TCCA denied Mr. Robertson's direct appeal claim that Warden Nelson's testimony was false and misleading, the TCCA decided *Estrada*, a case in which the 2005 TDCJ Regulation had been presented to the state courts. In *Estrada*, the TCCA held that because of the 2005 TDCJ Regulation, the testimony about reclassification from G3 to G2 for persons who received life-without-parole sentences (as opposed to the life sentence imposed on Mark Robertson) violated the 8th Amendment because the death sentence was based on materially inaccurate evidence.

> ***it relates to her credibility***.  So we turned that over this morning to them, along with the addendum that we received last week.

Defense:  That's accurate your Honor.  We wanted to memorialize this. This happened this morning.  I think the State wanted to make sure that I had possession of this information, in case, I wanted to make it part of this trial.  But I agree that he was not eligible as a candidate for life without parole and also memorialize the case that's on appeal also. And they have turned over a memorandum: Texas Department of Criminal Justice Union Classification Procedure, that specifies what they were talking about.  We wanted to memorialize that for both cases.

(Motion for New Trial, at 4-6).

In the Motion for New Trial, the defense presented expert witness evidence (S.O. Woods) to contradict the testimony of Warden Nelson.  S. O. Woods had worked for TDCJ for 31 years and at the time of his retirement, he had been the Assistant Director in charge of the Classification and Records System.  (MNT at 7).  Mr. Woods testified that Mark Robertson's classification status would not be "automatic." (MNT at 14-16).  When an inmate is received into TDCJ, the prison uses a software program that has all the policy rules and guidelines built-in, which helps to make the classification "decisions more consistent agency wide."  (MNT at 10). However, once the computer-generates a recommendation, it is still reviewed by two committees: a State Classification Committee, and thereafter a Unit Classification Committee.  (MNT at 9).  Depending on what evidence is before these committees, they can accept the recommendation or override it.  (MNT at 9).  One piece of evidence that these committees consider is an inmate's disciplinary record.

In her trial testimony before the jury, Warden Nelson testified that the disciplinaries of Mark Robertson were not minor because of the possible adverse consequences to prison administration that could come from the infractions.  Warden Nelson testified that an altered coffee pot can cause a fire hazard.  It can also cause the water in the pot to heat up enough to scald an officer if the inmate

38

splashes the water on a guard.  (RR 42:98-99).  Broken headphones can be used to create a telephone system among the inmate cells.  Warden Nelson testified that headphones had been used to transmit gang information.  (RR 42:100).  Warden Nelson testified that inmates have used Benadryl to alter their states of mind by mixing it with other substances.  (RR 41:101).

In contrast, during cross-examination at the Motion for New Trial, the Dallas DA's questions characterized Mr. Robertson's record  as "the lack of any serious disciplinaries – actually, I believe there was a good seven-year period where he had no disciplinaries at all."  (MNT at 40).  In support of its radically different position at the Motion for New Trial that Mr. Robertson's infractions were minor, the State presented an affidavit from Cay Cannon, a member of the State Classification Committee, opining that Mr. Robertson would be classified as a G2.  *See* MNT Exhibit 1.  Even the TCCA's direct appeal opinion found that "appellant's disciplinary record during the eighteen years he spent on death row contained only *minor infractions* ...."  (Emphasis supplied).  *Robertson*, 2011 WL 1161381, at *7.

S. O. Woods also contradicted Warden Nelson's testimony that TDCJ staff was underpaid and understaffed.  (MNT at 25-30).  Mr. Woods testified that Warden Nelson's assertion that TDCJ was 4,000 correctional officers short was high.  Based on Mr. Woods inquiries, TDCJ was down by 900 officers and that "nine hundred is just such a minuscule number out of 26,000, that it's manageable,"  (MNT at 25-26).  S.O. Woods also testified:

> They're getting a seven percent raise out of that last legislative session, which is more than most people are getting nowadays."

> The correctional staff that I know ... [t]hey were making a pretty substantial salary based on [mandatory] overtime, ... getting paid for it at time and a half.

(MNT at 25-26).

S.O. Woods corrected the misleading impression by Warden Nelson that general population was more violent that administrative segregation.  Mr. Woods testified that there are 9,000 inmates that are segregated and 150,000 that are "free to go to jobs and be in the hallways and living areas."  (MNT at 23).  Because of the greater volume, there would be more incidence of violence among the general population than among the segregated population.  Further, the inmates in administrative segregation are highly controlled, housed in single-cells, and restrained when they are out of their cells.  (MNT at  23).  Mr. Woods concluded that TDCJ "does a really good job of handling a lot of bad people.  It's a relatively safe place to work and be."  (MNT at  25).

Finally, Mr. Woods addressed Warden Nelson's testimony that the prison is filled with psychopaths.  Mr. Woods testified: "I wouldn't suspect that the population of psychopaths in the prison is too terribly much higher than that outside the prison. ... [A]s far as a general statement that every inmate is a psychopath, I think that's really way off."  (MNT at 30).

On November 9, 2009, the trial court denied the motion.  (MNT at 91).


### 4.        The Direct Appeal Opinion

On March 19, 2010, Mark Robertson filed his direct appeal brief in the TCCA.  Two issues in particularly addressing Warden Nelson's testimony were plead in issues 22 and 23:

22.        The trial court erred in denying appellant's motion for new trial

23.        The state denied appellant a fair trial and violated his constitutional right to due process under the Fifth, Sixth, Eighth and Fourteenth amendments by presenting false and highly misleading testimony on a crucial issue at the penalty phase of his trial.


On March 9, 2010, the TCCA issued its opinion denying relief.  In addressing issues 22 and 23, the opinion set out the five topics testified to by Warden Nelson:

Warden Nelson described how an inmate's living conditions are restricted through the use of a classification system ranking inmates from G1 (least restrictive) through G5 (most restrictive) and administrative segregation. Appellant complains about the warden's statements concerning the following: that appellant would automatically be classified as a G3 inmate; that prison personnel are underpaid and short staffed, that one officer may look after 150 inmates, and that a year previously the Texas Department of Criminal Justice was 4,000 officers short; that there is more violence in the general population than in administrative segregation; that inmates can come and go from their cells to work; and that prison is filled with psychopaths. At appellant's hearing on the motion for new trial, appellant presented experts S.O. Woods and Dr. Mark Vigen, whose testimony was intended to counter the warden's testimony and show that her testimony was false or misleading.

*Robertson*,  2011 WL 1161381, at *7.

The TCCA ruled that "Appellant has not demonstrated that Warden Nelson's testimony was false or misleading." *Robertson*,  2011 WL 1161381, at *10.

**B.      The TCCA ruling that Robertson "has not demonstrated that Warden Nelson's testimony was false or misleading," was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings"**

The TCCA ruling that Robertson "has not demonstrated that Warden Nelson's testimony was false or misleading," was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d)(2).

**1.      Warden Nelson's testimony was false and materially inaccurate, which the State failed to correct**

Warden Nelson's testimony before the jury was false and materially inaccurate.  *See Napue v. Illinois,* 360 U.S. 264, 269 (1959).  Warden Nelson left the jury with the mis-impression that the disciplinary infractions of Mr. Robertson made him a future danger.  She testified to a speculative "parade of horribles," with no evidence whatsoever that Mr. Robertson had altered his coffee pot

and scalded a guard with boiling water, or broke his headphones and transmitted gang information.

Other testimony of Warden Nelson was equally false and materially inaccurate (*e.g.,* automatic promotion to a G2 status when in fact the computer-generated classification recommendation is reviewed and accepted or rejected, first by a state level committee, followed by a unit level committee; TDCJ staff was underpaid and understaffed; general population was more violent than administrative segregation, and the prison is filled with psychopaths). Mr. Woods had been the Assistant Director in charge of the Classification and Records System. (MNT at 7). Based on his actual 31 years of experience working in TDCJ, Mr. Woods offered evidence that proved Warden Nelson's testimony as to these various topics was false and materially inaccurate. *See* Statement of Facts, *supra.*

The State of Texas knew that the testimony of Warden Nelson was false and materially inaccurate in *Robertson.* For example, at the hearing on the Motion for New Trial, the prosecutor formulated cross-examination questions that characterized Mr. Robertson's record as "the lack of any serious disciplinaries – actually, I believe there was a good seven-year period where he had no disciplinaries at all." (MNT at 40). Even the TCCA in its direct appeal, characterized Robertson's "disciplinary record during the eighteen years he spent on death row [as] contain[ing] only ***minor infractions*** ...." (Emphasis supplied). *Robertson,* 2011 WL 1161381, at *7.

Even though the State of Texas knew that the testimony of Warden Nelson was false and highly misleading, the State failed to correct it. See *Estrada v. State,* 313 S.W.3d 274, 287 (Tex. Crim. App. 2010) (Estrada "not only involves the erroneous admission of evidence, as in *Saldano,* but, unlike *Saldano,* it also involves ***the State's duty to correct "false" testimony whenever it comes to the State's attention***. *See Napue v. Illinois,* 360 U.S. 264, 269 (1959) (conviction obtained through perjury, "known to be such by representatives of the State," violates due process, and the

same result obtains when the State, although not soliciting perjury, allows it to go uncorrected when it appears)...."

> ### 2. Warden Nelson's testimony was not harmless.  The jury never learned of her materially inaccurate testimony in *Robertson* and in an unrelated capital case, *Lizcano* – which "relates to her credibility."  The jury relied on Nelson's testimony in its future dangerousness deliberations

The testimony of Warden Nelson was not harmless.  *After* the trial concluded, the Dallas DA admitted that Warden Nelson had given inaccurate testimony in another capital case (Lizcano) about G2/G3 classification status, and that "relates to her credibility."  (Motion for New Trial, at 4-6).  The *Robertson* jury never knew that Warden Nelson had given inaccurate testimony in Lizcano.  And *after* the trial concluded, the TCCA made a fact-finding that the prison infractions of Mr. Robertson were minor.  The jury never knew this information either during its future dangerousness deliberations.  These two salient pieces of information cast doubt on Nelson's credibility as an expert who was knowledgeable about TDCJ's classification status, violence in prisons, and future dangerousness. (RR 42:57).

In *Velez v. State*, AP-76,051, 2012 WL 2130890, the TCCA reversed and remanded a capital case for a new sentencing trial because of the inaccurate testimony of the State's testifying future dangerousness expert (Merillat).  The decision of the TCCA was preceded by a harm analysis.  In *Velez*, the TCCA found the testimony was not harmless because:

- • Merillat's "extensive credentials increased his credibility as a person knowledgeable about violence in prisons and future dangerousness." *Velez*, 2012 WL 2130890 at 32;

- • Merillat had testified to the high level of violence inside TDCJ; and

- • the defendant's inmate records showed only minor offenses.

Like *Velez*, the materially inaccurate testimony of Warden Nelson in *Robertson* is not harmless.

- Warden Nelson's extensive credentials[13] increased her credibility as a person knowledgeable about violence in prisons and future dangerousness. *Compare Velez*, 2012 WL 2130890 at 32;

- Warden Nelson described violence "as more prevalent in general population than in administrative segregation or death row." *Robertson*, 2011 WL 1161381 at *9; *compare Velez*, 2012 WL 2130890 at 32;

- Robertson's inmate records showed only minor offenses.[14]

Further exacerbating the harm, the prosecutor stressed the testimony of Warden Nelson in arguing that Mark Robertson was a future danger: ".... Well, you know from the warden, he['s] not gone [sic] be locked down anymore, if you give him a life sentence. (RR 43:23). ...."

As reflected in Jury Notes 2 and 3, the jury heeded the prosecution's warning, and took Warden Nelson's testimony into consideration during their deliberations. The jury notes asked about two particular issues that Warden Nelson testified to:

**Jury Note No. 2**
If Mark Robertson is given a life sentence, given his 18 years incarceration would he enter as G2 or G3? If not, at what level would he enter and how long before he might achieve a G2 status? (CR 1:202)

**Jury Note No. 3**
We would like to understand the date of Mark Robertson's six prison infractions.

---

[13]   Warden Nelson had testified that she had started out as a correctional officer and worked her way through the ranks of sergeant, lieutenant, captain, major and as of the date of the trial, she had achieved the rank of assistant warden of the Christina Melton Crane Unit in Gainesville, TX. (RR 42:57, 58). Warden Nelson further burnished her credentials before the jury with testimony that she had been employed on five different facilities with different custody levels, and that 18 of her 20 years with TDCJ was in male correctional facilities. (RR 42:58).

[14]   The TCCA's direct appeal opinion found that Robertson's prison infractions were "minor." *Robertson*, 2011 WL 1161381, at *7.

(CR 1:205).

Based on the jury's answers to the special issues, Mr. Robertson was sentenced to death. (CR 1:210)

Hence, the *Robertson* death-sentence was based on the false and materially inaccurate testimony of Warden Nelson, whose questionable knowledge as an expert on TDCJ was not made known to the jury. *See Simmons v. South Carolina,* 512 U.S. 154, 160, 165–66 (1994) (defendant "was prevented from rebutting information that the [jury] considered, and upon which it may have relied, in imposing the sentence of death" and jury "was denied a straight answer about [defendant's] parole eligibility even when it was requested" in a jury note).

Because Mark Robertson's death sentence was based on materially inaccurate evidence and the error was not harmless, the 8th and 14th amendment rights of Mr. Robertson were violated. *See Johnson v. Mississippi,* 486 U.S. 578, 590, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (death sentence based on "materially inaccurate" evidence violates Eighth Amendment).

Habeas relief should be granted because the state court's decision to deny relief was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  28 U.S.C. § 2254(d)(2).

## CONCLUSION

For the reasons set forth above, Mr. Robertson is entitled to relief from his unconstitutional conviction and sentence.

WHEREFORE, Mr. Robertson prays that this federal court issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

Respectfully submitted,

_Lydia M.V. Brandt_

_____

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

46

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK ROBERTSON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 3:13-CV-728 |
| | § | |
| | § | (Death Penalty Case) |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## VERIFICATION

I, Lydia M.V. Brandt, pursuant to 28 U.S.C. § 2242, acting on behalf of Petitioner, certify under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct to the best of my belief.

DATE:          January 7, 2014

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
Counsel for Petitioner

47

## CERTIFICATE OF SERVICE

This certifies that on January 7, 2014, I electronically filed the foregoing document with the clerk of court using the electronic case filing system of the court.  The electronic case filing system sent a notice of electronic filing to  Thomas, Jones, Assistant Attorney General and Counsel for Respondent, Office of the Attorney General, Postconviction Litigation Division,  P.O. Box 12548, Capitol Station, Austin, TX 78711.

_____
Lydia M.V. Brandt, Esq.

cc:   Mr. Mark Robertson, #000-992
      Polunsky Unit, TDCJ
      3872 FM 350 South
      Livingston, TX 77351-8580

48

**EXHIBITS**

Exhibit 1:     Ex Parte Motion to Appoint Forensic Psychologist to Assist in Evaluation, Preparation, and Presentation of a Defense, A-  Curriculum Vita, B- Terms of Engagement Contract

Exhibit 2:     Dr. Goodness Invoices Analyzed

Exhibit 3:     Collateral Interview List

Exhibit 4:     PI Hunt billing records

Exhibit 5:     Records Review #1 (TOC)

Exhibit 6:     Hector Becerra, LOS ANGELES TIMES, *El Monte is Down on Its Luck* (May 3, 2009)

Exhibit 7:     *Mental Illness & Violence:  Multiple Interacting Factors Contribute to Violent Behavior*, Harvard Medical School

Exhibit 8:     New York University Child Study Center, *Children's Resilience in the Face of Trauma* (July 9, 2010)

Exhibit 9:     Mayo Clinic staff, *Reactive attachment disorder* (July 6, 2011)