UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARK ROBERTSON,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Petitioner,　　　　　)
　　　　　　　　　　　　　　　　　　)　　　CIVIL ACTION NO.
VS.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　　3:13-CV-0728-G
LORIE DAVIS, Director, Texas　　　　)
Department of Criminal Justice,　　　)
Correctional Institutions Division,　　)　　　(Death Penalty Case)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Respondent.　　　　　)

MEMORANDUM OPINION AND ORDER

Petitioner Mark Robertson has filed an amended application for a writ of

habeas corpus under 28 U.S.C. § 2254 ("Amended Petition") (docket entry 47),

asserting claims that his trial counsel provided ineffective assistance and that his due

process rights were violated by the presentation of false or inaccurate evidence in the

punishment stage of his trial.  The application is **DENIED**.

**I**

In 1991, Robertson was convicted of capital murder and sentenced to death

for the 1989 robbery and murder of Edna Brau in Dallas County, Texas.  See *State v.

Robertson*, No. F89-85961-NL (Crim. Dist. Ct. No. 5, Dallas Co., Tex. Feb. 11,

1991).  Clerk's Record ("CR") (docket entry 27) at 321-25.  His conviction and sentence were affirmed on direct appeal.  See *Robertson v. State*, 871 S.W.2d 701 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 853 (1994).  The state court then set an execution date, but withdrew it to allow Robertson to file his application for a post-conviction writ of habeas corpus in state court, and then for the state court to give full consideration to it.  The state district court sitting in review of the habeas petition ("State Habeas Court") recommended that post-conviction habeas relief be denied.  See *Ex parte Robertson*, No. W89-85961-NL-(A) (Crim. Dist. Ct. No. 5, Dallas County, Tex. June 26, 1998).  These findings and recommendation were adopted by the Texas Court of Criminal Appeals ("CCA").  See *Ex parte Robertson*, Writ No. 30,077-01 (Tex. Crim. App. Nov. 18, 1998).  Robertson then filed an application for habeas relief in federal court, which was also denied.  See *Robertson v. Johnson*, 3:98-CV-2768-G (N.D. Tex. May 15, 2000), *COA denied sub nom. Robertson v. Johnson*, 234 F.3d 890 (5th Cir. 2000), *vacated and remanded*, 533 U.S. 901 (2001), *en banc denial of relief sub nom. Robertson v. Cockrell*, 325 F.3d 243 (5th Cir. 2003).

Following the conclusion of Robertson's original state and federal post-conviction review, the state court again set his execution for August 20, 2003.  On August 12, 2003, Robertson filed a subsequent application for writ of habeas corpus and motion to stay his execution in the CCA, which authorized the subsequent application and granted the stay of execution.  See *Ex parte Robertson*, No. 30,077-02

(Tex. Crim. App. Aug. 19, 2003) (docket entry 27-36 at 275-276).  Following the remand, the CCA adopted the trial court's findings that Robertson had presented mitigating evidence for which, under *Penry v. Lynaugh*, 492 U.S. 302 (1989), there had to be an adequate means for the jury to consider beyond the limits of the special issues, that Robertson had requested such a means, and that, when presented with the nullification instruction, Robertson objected that it still did not give the jury a proper means to consider his mitigating evidence.  See *Ex parte Robertson*, No. AP-74,720, 2008 WL 748373 (Tex. Crim. App. Mar. 12, 2008).  The CCA granted relief, reversed the sentence, and remanded for a new trial on punishment.  See *id.*

On retrial with the new special issues, the jury again answered them in a manner that required imposition of a death sentence.  *See* State Clerk's Record of Second Punishment Trial ("SCR") (docket entry 27-42) at 197-99, 210-11.  The CCA affirmed the new death sentence.  See *Robertson v. State*, No. AP-71,224, 2011 WL 1161381 (Tex. Crim. App. Mar. 9, 2011), *cert. denied*, 565 U.S. 1095 (2011).  On state post-conviction habeas review, Robertson presented one claim to the state district court on habeas review:  that trial counsel provided ineffective assistance for failing to investigate and present mitigating evidence.  The state habeas court conducted an evidentiary hearing and entered findings, conclusions and a recommendation to deny relief.  *See* State Clerk's Habeas Record following Second Punishment Trial ("SHR") (docket entry 28-27) at 1126-99.  The CCA adopted the

findings "except for paragraphs 1, 2, and 3, which indicate that the allegation is procedurally barred," and denied relief. *Ex parte Robertson*, No. WR-30,077-03, 2013 WL 135667, at *1 (Tex. Crim. App. Jan. 9, 2013).

## II

At the retrial, the prosecution entered into evidence multiple confessions that Robertson gave that he had shot his friend, Sean Hill, while they were fishing, then murdered Hill's grandmother, Edna Brau, stole her purse and jewelry and Hill's drugs and left in Brau's car. The CCA quoted from Robertson's written confession.

> On Saturday night around 9 PM I decided to walk over to Sean's house on Hathaway where he lived with his grandmother. When I got there, Sean was in his room watching T.V. We sat around watched TV and did some pot and crank. We then decided to go fishing out in the backyard. We were using one stick with a string and a hook. We would trade off, I think we caught some seven catfishes. While we were fishing, I think we were kneeling. I pulled my gun out of my pants and shot Sean once in the head. After I shot him, Sean fell in the water. I then ran in the house through Sean's bedroom and into the bathroom where I splashed some water over my face. I then walked into the den where Mrs. Hill, Sean's grandmother, was watching TV and I shot her once. I unplugged the TV because it was playing and so was the radio in the bedroom.

> I looked through her bedroom drawers and found her purse on the make-up counter. I saw some costume jewelry but left it alone. I did take a wristwatch which I later threw away in a garbage can but I don't remember where. I then ran into Sean's room and took his crank which was left on the bed. I then drove off in Mrs. Hill's car. I went on home and then went to Showtime on Greenville and

Lover's where I wiped it all down and left it there.  I then walked back home.  Next day while listening to the evening news I heard about their bodies being found.  I couldn't sleep for the next couple of days so I figured that I would just leave.  I walked back to the parking lot at Showtime where I got in the car and decided to drive to Las Vegas where my parents used to bring me.  I had left the car in the parking lot.  I threw the purse away in a dumpster at the Village Apts.  I think that I left on Tuesday sometime around 4 PM.  I drove all the way to Albuquerque, N. Mexico where I spent the night and the following day I drove to Vegas.  I was staying at the SuLinda Motel in Vegas.  I met Nikki two or three days later at the Circus-Circus.  I used my roommate's money to get to Vegas.  He had some $700.00 in cash in his room.  I think that Mrs. Hill's purse had some $37.00 in cash which I took.  These past few days I didn't know what to do and when I got arrested I felt relieved for the most part because I didn't have to run anymore.

*Robertson*, 871 S.W.2d at 704-05.  The state court findings regarding these confessions are entitled to deference under 28 U.S.C. 2254(e).

### III

Before this court, Robertson makes two claims for federal habeas relief:
(1) that trial counsel failed to adequately investigate and develop mitigating evidence Amended Petition at 15-50, and (2) that his death sentence was based on materially inaccurate evidence, Amended Petition at 51-62.  Respondent Lorie Davis asserts that Robertson's first claim is unexhausted and procedurally barred by the Texas abuse-of-the-writ doctrine, Answer (docket entry 50) at 2, 48-61, and that both claims lack merit.  Answer at 61-71.  Robertson agrees that his first claim is

unexhausted but argues that it comes within the exception to the procedural bar created in *Martinez v. Ryan*, 566 U.S. 1 (2012), as applied to Texas in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  Amended Petition at 38-50; Reply (docket entry 51) at 4-7.

## IV

Federal habeas review of these claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), setting forth preliminary requirements that must be satisfied before reaching the merits of a claim made in these proceedings.

### A.  Exhaustion

Under the AEDPA, a federal court may not grant habeas relief on any claim that the state prisoner has not exhausted in the state corrective process available to protect his rights.  *See* 28 U.S.C. § 2254(b)(1)(A); *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The federal court may, however, deny relief on the merits notwithstanding any failure to exhaust.  *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005), *cert. denied*, 549 U.S. 838 (2006).

### B.  State-Court Procedural Determinations

If the state court denies the claim on state procedural grounds, a federal court will not reach the merits of those claims if it determines that the state law grounds are independent of the federal claim and adequate to bar federal review.  See *Sawyer*

*v. Whitley*, 505 U.S. 333, 338 (1992).  The same rule would apply "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *modified by Martinez v. Ryan*, 566 U.S. 1 (2012); *Woodfox v. Cain*, 609 F.3d 774, 793 (5th Cir. 2010).

If, however, the state procedural determination is based on state grounds that were inadequate to bar federal habeas review, or if the habeas petitioner shows that an exception to the bar applies, the federal court must resolve the claim without the deference AEDPA otherwise requires.  See *Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000); *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997), *cert. denied*, 523 U.S. 1139 (1998); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) ("the AEDPA deference scheme outlined in 28 U.S.C. § 2254(d) does not apply" to claims not adjudicated on the merits by the state court); *Woodfox*, 609 F.3d at 794 (the AEDPA deferential standard would not apply to a procedural decision of the state court).

### C.  State-Court Merits Determinations

If the state court denies the claim on the merits, a federal court may not grant relief unless it first determines that the state court unreasonably adjudicated the claim, as defined in § 2254(d):

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim --
>
>> (1) resulted in a decision that was contrary
>> to, or involved an unreasonable application
>> of, clearly established Federal law, as
>> determined by the Supreme Court of the
>> United States; or
>>
>> (2) resulted in a decision that was based on
>> an unreasonable determination of the facts in
>> light of the evidence presented in the State
>> court proceeding.

*Id.*

In the context of the § 2254(d) analysis, "adjudicated on the merits" is a term of art referring to a state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997). This provision does not authorize habeas relief, but restricts this court's power to grant relief to state prisoners by barring the relitigation of claims in federal court that were not unreasonably denied by the state courts. The AEDPA limits, rather than expands, the availability of habeas relief. See *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98. "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court rulings be given the benefit of the doubt.'"  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citations omitted) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under the "contrary to" clause, a federal court is not prohibited from granting federal habeas relief if the state court either arrives at a conclusion contrary to that reached by the United States Supreme Court on a question of law or decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts.  See *Williams*, 529 U.S. at 412-13; *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.), *cert. denied*, 531 U.S. 1002 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.  The Supreme Court has repeatedly reaffirmed the high and difficult standard that must be met.

> "'[C]learly established Federal law'" for purposes of § 2254(d)(1) includes only "'the holdings, as opposed to the dicta, of this Court's decisions.'"  And an "unreasonable application of" those holdings must be "'objectively unreasonable,'" not merely wrong; even "clear error" will not suffice.  Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citations omitted).

Federal habeas relief is not available on a claim adjudicated on the merits by the state court, unless the record before the state court satisfies § 2254(d). "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. The evidence required under § 2254(d)(2) must show that the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

## V

In his first claim, Robertson complains that he was denied the effective assistance of counsel in the punishment retrial because his appointed counsel failed to conduct an adequate mitigation investigation. Amended Petition at 15-50. Specifically, Robertson asserts that his counsel "unreasonably narrowed the scope of, and prematurely ceased, the [mitigation] investigation despite red flags that signaled further investigation needed to be done into [Robertson's] mental state at the time of the offense, into maternal and paternal genetic-and-environmental influences, and into [Robertson's] early childhood." Amended Petition at 15.

Respondent asserts that this claim was not presented to the state court and is, therefore, unexhausted and now procedurally barred.  Answer at 48-52.  Robertson agrees that this claim was not presented to the state court, but argues that it comes within the exception to the procedural bar created in *Martinez*.  Amended Petition at 38-50; Reply at 5-7.  Respondent argues that the claim does not fall within the exception to the procedural bar created in *Martinez* because it is insubstantial and state habeas counsel was not ineffective.  Answer at 52-61.  In the alternative, Respondent asserts that the claim lacks merit.  Answer at 61-62.

A.  <u>State Court Action</u>

In the post-conviction habeas application filed in state court, Robertson presented one claim, that his "Sixth Amendment right to counsel was violated when he received ineffective assistance of counsel as a result of his legal team's failure to adequately investigate and present mitigation evidence as required by *Wiggins v. Smith*, 123 S.Ct. 2547 (2003) and *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003)."  SHR (docket entry 28-27) at 8.  The state court described the claim:

> In his sole ground for relief, Robertson complains trial counsel Richard Franklin and Robbie McClung failed to adequately investigate and present mitigation evidence, specifically that they were ineffective for (a) failing to follow mitigation expert Dr. Kelly Goodness' advice to present certain themes at trial (Application at 25-27); (b) failing to call psychologist Dr. Mark Vigen as a witness at trial (Application at 27-29); (c) failing to depose Robertson's friend Doris Jordi prior to trial and present the deposition to the jury (Application at 29-30); and

- 11 -

> (d) failing to obtain a copy of Robertson's 2001 clemency petition from former counsel Randy Schaffer's file. (Application at 30-31.)  In support of his claims of ineffectiveness Robertson cites *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) and *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003).

SHR at 1150 (citing State Habeas Application at 6, 16-17).  The state habeas court conducted an evidentiary hearing on this claim from January 23-26, 2012, Vol. 1-5, State Habeas Reporter's Record ("SHRR") (docket entry 28-22), and resolved disputed factual findings against Robertson in denying relief.

While the state habeas court concluded that the claim was procedurally barred because it could have been but was not presented in his direct appeal, the CCA did not adopt that finding.  Instead, the CCA adopted the state habeas court's alternative findings that denied this claim on its merits.  See *Ex parte Robertson*, No. WR-30077-03, 2013 WL 135667 at *1.

The adopted findings included details of the pretrial appointment of "highly qualified death penalty counsel" for the trial and appellate purposes that included trial assistance "to formulate and execute an effective trial strategy for mitigation." SHR (docket entry 28-25) at 1155-57.  The state court found that trial counsel put on a comprehensive mitigation case that "covered Robertson's life span and painted a picture of a person who suffered as an abused, parentless child, who turned to drugs as a result, and who ultimately thrived in the highly structured environment of TDCJ."  SHR (docket entry 28-25) at 1186.

182. The Court finds the defense team hired or consulted with the following experts in preparing Robertson's mitigation case:  forensic psychologist Kristi Compton; forensic psychologist and prison consultant Mark Vigen; clinical psychologist and substance abuse expert Ari Kalechstein; psychologist and mitigation expert Kelly Goodness; prison expert S.O. Woods; former Texas Department of Criminal Justice employee Larry Fitzgerald; and future dangerousness expert Jon Sorenson.  (Franklin Affidavit, p. 1; WR3: 54-55, 68-69, 81, 112-113).

* * *

185. The Court finds the defense team hired Dr. Goodness as a mitigation consultant.  (Tatum Affidavit, p. 1; Franklin Affidavit, pp. 2).  The Court finds Dr. Goodness worked closely with the defense team, investigated Robertson's background, and suggested salient potentially mitigating factors.  (Tatum Affidavit, p. 1).  The Court finds Franklin's following description of Dr. Goodness' role to be reliable:

> Dr. Goodness was our mitigation expert.  She began the process of gathering mitigation evidence by interviewing [Robertson], his family members, and friends who knew [Robertson] prior to his incarceration.  Dr. Goodness and her assistant prepared elaborate summaries of all interviews for the defense team's use.  The three defense attorneys participated in her interviews of the family members.  Dr. Goodness reviewed the entire defense file, including [Robertson's] educational and mental health records, and the discovery CDs provided by the prosecution.  The initial interviews and document review led her to other resources and individuals to contact and interview.  The mitigation investigation included gathering information and family photos.  She

- 13 -

developed ideas regarding which experts to consult based on the information gathered. Dr. Goodness recommended using Dr. Compton and Dr. Kalechstein. The team mutually decided to utilize Dr. Vigen, Mr. Woods, and Dr. Sorenson. Dr. Goodness and the defense team participated in numerous strategy meetings, email exchanges, updates on interviews, and discussions regarding her investigation. Prior to jury selection, Dr. Goodness offered opinions concerning the ideal defense juror and suggested scaled questions to be included in the juror questionnaire. She proposed evidence to present at trial, how to present it, questions to ask, and what order to ask them. Dr. Goodness was in the courtroom throughout trial. She offered critiques on the evidence as it developed and made recommendations regarding how to handle certain situations. She recommended specific direct-examination or cross-examination questions to ask during the testimony of various witnesses.

(Franklin Affidavit, pp. 2-3.)

186. The Court finds the attachments to Franklin's affidavit include a timeline of Robertson's life from birth to age 39 created by Dr. Vigen (Exhibit A), a summary of records titled "Document Review" (Exhibit B), and an outline by Dr. Goodness of information gathered (Exhibit C). (*See* Franklin Affidavit, p. 4). The Court finds these items are representative of the thoroughness of the mitigation investigation and reflect the wide variety of categories of documents that the defense team scrutinized for mitigation evidence (school records, military records, substance abuse treatment records, court records, probation records, police and jail records, and prison records) and the numerous individuals the team interviewed.

- 14 -

187. The Court finds McClung's following description of the development of the mitigation evidence to be reliable:

> Our initial strategy in developing the mitigation case was to obtain a detailed history from family members, particularly regarding the violence in [Robertson's] childhood home, the violence in his parents' marriage, and the family's progression to Texas. We contacted all of [Robertson's] siblings; however, only one sister agreed to testify. The next step in developing the mitigation case was to use professionals to explain to the jury how that type of a family history affects a person and how the family history particularly affected [Robertson].

> We utilized Dr. Compton to explain how the family's dysfunctional environment affected [Robertson's] prenatal, birth, and juvenile development and behavior. Dr. Compton was very familiar with the timelines of [Robertson's] development and life span. She utilized a power point presentation at trial and graphs to demonstrate the factors contributing to [Robertson's] development, including [Robertson's] father's genetic contribution (in other words his psychopathy), environmental influences, the series of abandonments [Robertson] was subjected to, and the trauma of witnessing physical abuse in his home.

> Our strategy in explaining who [Robertson] was to the jury continued with Dr. Ari Kalechstein, a psychologist and expert on addiction, who described the progression of [Robertson's] drug abuse. Evidence of [Robertson's] extensive substance abuse and Dr. Kalechstein's testimony were also the

- 15 -

basis of Richard's closing argument that Edna
Brau's murder was not deliberate beyond a
reasonable doubt and the jury should answer
"no" to the deliberateness special issue, on
the basis that [Robertson's] substance use
interfered with his development, contributed
to his impulsivity, and resulted in a lack of
thought processes during the offense.

The next prong of our strategy in the
mitigation case was to examine [Robertson's]
life from his incarceration to the present day.
Evidence [Robertson] was not violent while
on death row was the best evidence he was
not a future danger.  We were excited about
the jury having the opportunity to see that
[Robertson] successfully conformed his
behavior to the requirements of prison.  One
of the charms of [Robertson's] case was that
he was incarcerated on two different death
rows—the Ellis Unit until 1999, where far
fewer restrictions existed, and the present day
death row on the Polunsky Unit.  The jury
was able to see that in both situations, even
the less restrictive environment, [Robertson]
incurred only minor disciplinary infractions.

(McClung Affidavit, p. 2).

SHR (docket entry 28-25) at 1186-91.  These findings are entitled to deference

under 28 U.S.C. § 2254(e).

## B.  Law

Claims of ineffective assistance of counsel are measured by the two-pronged

standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  The first prong

of *Strickland* requires the habeas petitioner to show that counsel's performance was

deficient. See *id.* at 687. The second prong of this test requires the petitioner to show prejudice resulting from counsel's deficient performance. See *id.* at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. See *id.* at 697.

In measuring whether counsel's representation was deficient, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. See *id.* at 687-88; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied*, 509 U.S. 921 (1993). There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 562 U.S. 106. In *Richter*, the Supreme Court noted the "wide latitude counsel must have in making tactical decisions" and the need to avoid judicial second-guessing. *Id.* (quoting *Strickland*, 466 U.S. at 689). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a

reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.*, 562 U.S. at 110.

To satisfy the second prong of the *Strickland* test, the petitioner must show that counsel's errors were so serious "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The test to establish prejudice under this prong is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability under this test is "a probability sufficient to undermine confidence in the outcome." *Id.*

Claims not presented in the original state habeas proceeding are subject to a state procedural bar. Texas law precludes successive habeas claims except in narrow circumstances. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (West 2015). This is a codification of the judicially created Texas abuse-of-the-writ doctrine. See *Barrientes v. Johnson*, 221 F.3d 741, 759 n.10 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001). Under this state law, a habeas petitioner is procedurally barred from returning to the Texas courts to exhaust his claims unless the petitioner presents a factual or legal basis for a claim that was previously unavailable or shows that, but for a violation of the United States Constitution, no rational juror would have found for the State. See *id.* at 758 n.9.

The United States Court of Appeals for the Fifth Circuit has repeatedly "held that 'the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.'"  *Canales v. Stephens*, 765 F.3d 551, 566 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008)). Therefore, unexhausted claims that could not make the showing required by this state law would be considered procedurally barred from review on the merits in this Court unless an exception is shown.  See *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir.), *cert. denied*, 534 U.S. 945 (2001).

## C.  Analysis

Both parties agree that the claim now presented by Robertson in federal court was not properly exhausted by presenting it to the state court.  They disagree on whether the claim falls within the exception to procedural bar created in *Martinez*. To show that the ineffective-assistance-of-trial-counsel claim falls within the exception, Robertson must demonstrate (1) that the claim is "substantial" in that it "has some merit," and (2) that the claim was not presented to the state court because the habeas petitioner had no state habeas counsel or because his state habeas counsel was ineffective under the *Strickland* standard.  *Martinez*, 566 U.S. at 14.  Respondent can defeat this by showing either that the claim "is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support, or that the attorney in the

initial-review collateral proceeding did not perform below constitutional standards."
*Id.* at 16. Therefore, a determination of whether this claim falls within the
procedural bar first requires an examination of whether the asserted claim has any
merit.

In his amended petition, Robertson alleges that trial counsel were deficient in
that they prematurely ceased investigation of two areas: (1) "maternal-and-paternal
genetic-and-environmental influences, and into [Robertson's] early childhood,"
Amended Petition at 18-28, and (2) "the mental state underlying the behaviors of
Mark Robertson." Amended Petition at 28-34. Regarding prejudice, Robertson
alleges "upon information and belief" that a reasonable investigation into his psycho-
social history would have revealed

> that [Robertson] suffered substantial abuse at the hands of
> his biological father, as well as deprivation and neglect
> throughout childhood from all of his parental figures. In
> addition, he may have suffered from an untreated, but
> treatable, mental illness. Further, a chronology reflects
> that [Robertson] experienced one of the most significant of
> traumatic stressors of his life, the Circle Tallant Stressor,
> which adversely affected his cognitive abilities, including
> the ability to weigh costs and benefits and to override
> impulses with rational thought. [Robertson] spiraled out
> of control in the weeks immediately preceding, and
> culminated in, the murders of Saunders, Brau and Hill.
> ***Had the jury known the real Mark Robertson, they would
> not have sentenced him to death.***

- 20 -

Amended Petition at 35 (emphasis added).  The highlighted language above implies that the claim included the failure to ***present*** this information to the jury so that they could have known it, as may be required to show the prejudice prong of *Strickland*.

In her answer, Respondent characterizes the complaint that trial counsel failed to develop "and present" mitigating evidence in 5 areas:  "(1) regarding the paternal side of his family (*id.* at 26-27); (2) the psychological, emotional, and physical health of his mother to show that he was at risk for Reactive Attachment Disorder (*id.* at 27-29); (3) his early childhood years in the crime-ridden town of El Monte, California (*id.* at 29-34); (4) the trauma of his breakup with his girlfriend [Circle Lisa Tallant] months before the murders (*id.* at 34-37); and (5) evidence showing that he had a treatable mental illness (*id.* at 37-40)."  Answer at 12.  Respondent argues that Robertson failed to "demonstrate the required *Strickland* prejudice," because he did not show for any uncalled witness "that the witness's testimony would have been favorable," and "that the witness would have testified at trial."  Answer at 53 (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  "Robertson does not name the missing witnesses or the missing evidence, does not show that the witnesses or evidence is available, and does not show that such hypothetical testimony or evidence would have aided his cause."  Answer at 53.

In his reply, Robertson responds to this by clarifying his claim to eliminate any allegation that he has failed to ***present*** mitigating evidence and to narrow his claim to

a failure-to-investigate only, emphatically denying that he alleges any failure to

present mitigating evidence.

> However, the Director seeks to refute Mr. Robertson's
> IATC *Wiggins* Claim as though it were a failure-to present
> claim.  Specifically, the Director recasts Mr. Robertson's
> allegations that trial counsel failed to reasonably
> investigate their client's background as "in the nature of a
> claim complaining of an uncalled witness."  Doc #50 at 59
> of 79.  An allegation that trial counsel did not thoroughly
> investigate or made an unreasonable decision to cease
> investigating is <u>not</u> a claim complaining of an uncalled
> witness.  The latter concerns what evidence trial counsel
> decided not to present while the former concerns what
> information trial counsel failed to learn.

Reply at 2 (emphasis in original).  Robertson emphasizes that he does not assert any

failure to present mitigating evidence and does not carry forward any of those claims

made in the state court.  Reply at 2-3.

Notwithstanding the exhaustion question, Robertson's claim as clarified does

not assert the required prejudice.  To show prejudice, a habeas petitioner "must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  In

the context of a complaint that counsel failed to investigate and discover potential lay

or expert testimony about his background, abuse, mental state and any treatable

mental illness, a habeas petitioner must show how the undiscovered testimony would

have made a difference in the evidence presented at trial and in its outcome.

- 22 -

>An applicant "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable. See *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

*Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010). Only then can the reviewing court "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. Because Robertson has failed to make the required showing for this court to know what any allegedly missing evidence would have been, this court cannot reweigh the evidence in aggravation against such unknown evidence.

Although Robertson's petition attempts to show prejudice by alleging that the jury would not have sentenced him to death if they had "known the real Mark Robertson," he later contradicts this implied presentation element in his reply by withdrawing any allegation that trial counsel failed to present this evidence to the jury so that they could have known it. Without any corresponding allegation regarding how this failure to investigate impacted trial counsel's presentation to the jury deciding his punishment, Robertson does not say how any such failure could have resulted in harm or prejudice.

- 23 -

In the alternative, even if it is assumed *arguendo* that Robertson is asserting prejudice in trial counsel's failure to **present** mitigating evidence, Respondent's argument remains correct. Robertson has not made the prejudice showing required to complain of any uncalled witnesses, and his attempt to avoid this requirement by removing any allegation of deficient presentation seems to acknowledge that. Complaints regarding uncalled witnesses are "disfavored," as the decision whether to call a witness is a matter of trial strategy. *Gregory*, 601 F.3d at 352-53 (citing *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007), and *Alexander*, 775 F.2d at 602).

Robertson has also not rebutted the presumption of correctness afforded the relevant findings of the state court. These findings and the procedural history of this case show that this is not a case where trial counsel completely failed to investigate and present mitigating evidence. Indeed, Robertson had the benefit of multiple lawyers in his original trial, appeal, state and federal habeas proceedings and was granted a retrial specifically to "give the jury a proper means to consider his mitigating evidence" developed in the original trial. *Ex parte Robertson*, 2008 WL 748373, at *1. At the retrial, Robertson's counsel also sought and obtained the assistance of a team of punishment phase experts including "forensic psychologist Kristi Compton; forensic psychologist and prison consultant Mark Vigen; clinical psychologist and substance abuse expert Ari Kalechstein; psychologist and mitigation

expert Kelly Goodness; prison expert S.O. Woods; former Texas Department of Criminal Justice employee Larry Fitzgerald; and future dangerousness expert Jon Sorenson." SHR (docket entry 28-25) at 1187. The state court found that trial counsel utilized these experts to conduct a thorough mitigation investigation that included the review of a wide variety of documents, interviews with numerous individuals, and a time line of Robertson's life. SHR (docket entry 28-25) at 1189.

This claim asserts Robertson's current disagreement with his prior expert's opinions rather than a deficiency in the conduct of his trial counsel. Robertson claims that the opinion of his defense expert at trial "was not valid or reliable" because it did not have an "adequate factual foundation." Amended Petition at 36. Specifically, Robertson complains that his defense team obtained "anecdotal" information from multiple witnesses that his father was "a pretty violent, mean individual," Amended Petition at 21 (citing volume 41, Reporter's Record ("RR") at 72-74), but did not investigate his father's "psycho-social history, the environment and family into which [Robertson's father] had been born, or his mental and physical health." Amended Petition at 21. Robertson speculates that such an investigation "could have revealed that the behavior of [Robertson's father] was because of reasons other than that he was a psychopath." Amended Petition at 21.

Robertson also alleges that Dr. Compton failed to conduct an adequate inquiry into his early childhood, from "birth to age 5, his attachment to his mother or other

- 25 -

caretaker, and the caretaker's ability and willingness to nurture [Robertson] in infancy," before concluding that he suffered from reactive attachment disorder. Amended Petition at 23 (citing 41 RR 80-81).  Further, Robertson complains that his early childhood years in a rough, crime-filled area of California were inadequately investigated to show the environmental factors that influenced his early development. Amended Petition at 23-28.  Robertson also complains that these experts did not adequately investigate and consider the emotional impact on him resulting from the termination of his relationship with his girlfriend, Circle Tallant, who testified in the prior trial about their break-up and the abortion of their child.  Amended Petition at 28-31 (referring to this as the "Circle Tallant Stressor").  Robertson also complains that these experts did not adequately investigate and consider whether he suffered from a treatable bipolar disorder mentioned in the transcripts of the prior trial that they reviewed rather than the untreatable anti-social personality disorder that they diagnosed him to have.  Amended Petition at 31-34.

These complaints are directed against his prior experts rather than counsel.  To make a viable claim of the deprivation of the effective assistance of counsel under *Strickland* for failing to provide an expert with information, the petitioner must show that the expert requested the information and that the information would have made a difference to the expert's opinion.  See *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997), *cert. denied*, 523 U.S. 1145 (1998) (cited with approval by *Roberts v.*

*Dretke*, 356 F.3d 632, 640 (5th Cir. 2004), *cert. denied*, 544 U.S. 963 (2005)); *Segundo*

*v. Stephens*, No. 4:10-CV-0970-Y, 2015 WL 3766746 at *2 (N.D. Tex. June 17,

2015) *COA denied sub nom, Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. July 28,

2016); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995), *cert. denied*, 517

U.S. 1111 (1996).

In *Hendricks*, the United States Court of Appeals for the Ninth Circuit

observed that an attorney has no duty to provide information to an expert that is not

requested by the expert.

> To now impose a duty on attorneys to acquire sufficient
> background material on which an expert can base reliable
> psychiatric conclusions, independent of any request for
> information from an expert, would defeat the whole aim of
> having experts participate in the investigation.  An integral
> part of an expert's specialized skill at analyzing
> information is an understanding of what information is
> relevant to reaching a conclusion.

70 F.3d at 1038.  Further, a claimant should show that the testifying experts would

have changed their opinions if they had the missing information.  See, *e.g.*, *Roberts v.*

*Singletary*, 794 F. Supp. 1106, 1131-32 (S.D. Fla. 1992) (holding ineffective

assistance of counsel not shown when experts did not state that the additional

information would have changed the diagnosis in any meaningful way and did not

express inability to base conclusions on available information), *aff'd*, 29 F.3d 1474

(11th Cir. 1994), *cert. denied*, 515 U.S. 1133 (1995).

In contrast, when counsel provides the defense expert with the information that the expert considered necessary to form an expert opinion, and the expert does, in fact, investigate the potential defense, "[l]ater disagreement by other experts as to the conclusions does not demonstrate a violation of *Strickland*." *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011), *cert. denied*, 565 U.S. 1276 (2012). In *Segundo v. Davis*, "trial counsel obtained the services of a mitigation specialist, fact investigator, and two mental-health experts" who "conducted multiple interviews with Segundo and his family, performed psychological evaluations, and reviewed medical records." 831 F.3d at 352. Segundo alleged that trial counsel was ineffective for failing to provide a social history to properly investigate his intellectual disability, "[b]ut none of the experts retained by trial counsel indicated that they were missing information needed to form an accurate conclusion that Segundo is not intellectually disabled." *Id.* The Court of Appeals held that "[c]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." *Id.* (quoting *Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004)); see also *Turner v. Epps*, 412 Fed. App'x 696, 704 (5th Cir. 2011) ("While counsel cannot completely abdicate a responsibility to conduct a pre-trial investigation simply by hiring an expert, counsel

should be able to rely on that expert to alert counsel to additional needed information . . . ."), *cert. denied*, 565 U.S. 1115 (2012).

Robertson has not shown that his prior experts did not have sufficient information, that any of the prior experts requested from counsel the information that he now identifies, or that if they had, that any of the information his experts would have received would have changed any of their opinions.  There is no evidence showing that trial counsel did anything other than rely upon what appeared to be objectively reasonable evaluations and opinions of his own expert witnesses.

Robertson has not satisfied the deficiency prong of *Strickland* because he merely complains about his experts and not trial counsel.  His claim boils down to a disagreement between experts that is insufficient to support relief on an ineffective assistance of counsel claim.  "It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness."  *Waye v. Murray*, 884 F.2d 765, 766-67 (4th Cir.), *cert. denied*, 492 U.S. 936 (1989), quoted with approval in *Woodward v. Epps*, 380 F. Supp. 2d 788, 791 (S.D. Miss. 2005).  Such a disagreement between experts does not establish ineffective assistance of counsel.  See *Bell v. Thompson*, 545 U.S. 794, 809-10 (2005) (approving decision of Tennessee Court of Criminal Appeals that trial counsel could not be faulted for relying upon the opinions of his two medical experts).

Robertson has not satisfied the prejudice prong of *Strickland* because he does not allege any failure to present mitigating evidence that could have resulted from any deficient investigation, what the missing evidence would have been, and how it would have made a difference at trial.  Because Robertson has not satisfied either prong of *Strickland*, this claim lacks any merit and may be denied on that basis notwithstanding any failure to exhaust.  *See* 28 U.S.C. § 2254(b)(2).

The exhaustion problem raises further obstacles.  Before this court, Robertson has expressly abandoned his exhausted claim.  While this court would consider *de novo* an unadjudicated claim that is shown to come within the *Martinez* exception, the court is not required to grant funding or an evidentiary hearing for a procedurally barred claim in the hope that it might someday be shown to come within an exception.  The court does not encourage habeas petitioners to abandon potentially meritorious claims that were thoroughly exhausted in the state court or to transform fully exhausted claims into unexhausted ones in order to avoid the *Pinholster* limitation on evidentiary development of the exhausted claims in federal court.  This use of *Martinez* would run counter to the exhaustion requirement and "encourage sandbagging in state court to obtain *de novo* review of a petitioner's 'real' claim in federal court."  *Ward v. Stephens*, 777 F.3d 250, 257 n.3 (5th Cir.), *cert. denied*, 136 S. Ct. 86 (2015).

To be clear, Robertson's allegations before this court differ from those presented to the state court not only because he expressly disavows any presentation element in his complaint against trial counsel. Robertson's reply also clarifies that he refuses to assert the allegations of the exhausted claim presented to the state court in his post-conviction habeas application.

> In this proceeding, Mr. Robertson has <u>not</u> alleged that trial counsel were deficient for (1) failing to follow the presentation recommendations of defense mental health expert Dr. Kelly Goodness; (2) failing to present testimony from Dr. Mark Vigen; (3) failing to present deposition testimony from Doris Jordi; (4) failure to obtain a copy of Mr. Robertson's clemency application; or (5) telling jurors that Mr. Robertson had previously been sentenced to death. Those issues were raised in state habeas, but, as will be more fully discussed below, Section III. infra, Mr. Robertson did <u>not</u> carry forward the state habeas IATC claims into federal habeas.

Reply (docket entry 51) at 2-3 (emphasis in original).

Because Robertson has not incorporated those complaints into his federal petition, and expressly refuses to do so, it appears that he has indeed alleged a new and unexhausted claim. This does not, however, entitle him to funding and evidentiary development in federal court. See *Allen v. Stephens*, 805 F.3d 617, 638-39 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 2382 (2016) ("we have rejected the argument that *Martinez* and *Trevino* require the granting of funds to develop claims such as Allen's.") (citing *Crutsinger v. Stephens*, 576 Fed. App'x 422, 431 (5th Cir. 2014) ("*Martinez* . . . does not mandate pre-petition funding, nor does it alter our rule that a

prisoner cannot show a substantial need for funds when his claim is procedurally barred from review."), *cert. denied*, 135 S.Ct. 1401 (2015).  This also does not eliminate the presumption of correctness afforded relevant state court findings, or a habeas petitioner's duty to rebut such findings by clear and convincing evidence under 28 U.S.C. 2254(e).

Even if Robertson's claim may be read to include a complaint regarding counsel's failure to present evidence to his jury at trial, he has not shown that such a complaint would have any merit.  Therefore, he has not identified a substantial claim of ineffective assistance of trial counsel that could satisfy this element of *Martinez* and come within this exception to procedural bar.  Further, Robertson has not shown that his state habeas counsel provided ineffective assistance in order to satisfy that element of *Martinez*, nor, does it appear, could he.

State habeas counsel obtained investigative and expert assistance and presented a *Wiggins* claim of ineffective assistance of trial counsel to the state court in post-conviction habeas review that was arguably stronger than the instant claim.  That claim included a complaint that trial counsel failed to present mitigation evidence at trial, went beyond a mere disagreement between experts, and was considered by the state court to be substantial enough to warrant a three-day evidentiary hearing.  Further, since Robertson has not presented a substantial claim of ineffective assistance of trial counsel that was not presented to the state court,

state habeas counsel could not have been ineffective in failing to present it.  See

*Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court

that "habeas counsel was not ineffective in failing to raise [a] claim at the first state

proceeding" because "there was no merit to [the petitioner's] claim"), *cert. denied*, 134

S.Ct. 2876 (2014); *Beatty v. Stephens*, 759 F.3d 455, 466 (5th Cir. 2014), *cert. denied*,

135 S.Ct. 2312 (2015); *Braziel v. Stephens*, No. 3:09-CV-1591-M, 2015 WL 3454115

at *10 (N.D. Tex.), *COA denied*, 631 F. App'x 225 (5th Cir. 2015), *cert. denied*, 136

S. Ct. 1825 (May 2, 2016).

Therefore, Robertson's first claim is **DISMISSED** as unexhausted and

procedurally barred.  In the alternative, it is **DENIED** for lack of merit

notwithstanding any failure to exhaust.

## VI

In his second claim, Robertson complains that he was denied his rights under

the Fifth, Sixth, Eighth and Fourteenth Amendments "because his death sentence

was based on materially inaccurate evidence from Warden Nelson."  Amended

Petition at 51.  Specifically, Robertson argues that the state court decision that he

had not shown that Warden Nelson's testimony was "false or misleading," was

contrary to and an unreasonable application of federal law, and also based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceedings in violation of 28 U.S.C. § 2254(d).  Amended Petition at

57-62.  Construing this as a due process claim, Respondent argues that it lacks merit.

Answer at 62-71.

## A.  State Court Action

On direct appeal to the CCA from the new death sentence, Robertson

complained that the state had presented false and misleading testimony from its

expert witness, Warden Melodye Nelson, regarding the following five matters:

> (1) whether or not the Defendant would "automatically"
> enter the system as a [classification level] G3 [prisoner];
> (2) the prison personnel were underpaid, short staffed and
> one officer is often looking after 150 inmates; (3) there was
> more violence in the general population than there was in
> administrative segregation; (4) a year ago the Texas
> Department of Criminal Justice was 4,000 correctional
> officers short; an inmate can come and go from their cells
> to work; (5) the prison is filled with psychopaths.

Appellant's Brief before CCA (docket entry 27-44 at 105) at 77.  To prove the falsity

of Nelson's testimony, Robertson relied upon the testimony of his expert, S.O.

Woods, Jr., that was offered in the hearing on his motion for new trial.

Regarding Nelson's testimony that Robertson would "automatically" enter the

system at the middle level restriction of a G3 classified inmate if he had been given a

life sentence, Woods agreed that was the "rule of thumb for any sentence over 50

years."  Supplemental Reporter's Record ("Supp. RR") (docket entry 30) at 9.

Woods explained that the prison's computer system would have made the assessment

of that level or the less restrictive G2 level, and that the responsible committee would

- 34 -

have probably assigned the less restrictive G2 level because they did not have reason to override the computer assessment.  Supp. RR at 40.  Woods' only concern was that he thought that the term "automatic" was "not a good choice of words."  Supp. RR at 15.  "I never disagreed with that decision. I just said it wasn't automatic."  Supp. RR at 40.

In finding that Robertson had not shown any falsity in this part of Nelson's testimony, the CCA stated "[a]lthough Woods disagreed with the warden's choice of words, the evidence indicates that [Robertson] was eligible for [the even less restrictive] G2 status if given a life sentence." *Robertson*, 2011 WL 1161381 at *8.  The CCA also found that there was no reason in the record to deviate from that determination.

Regarding Nelson's testimony that the prison personnel were underpaid, short-staffed and one officer may look after 150 inmates, Woods agreed that the prison system was understaffed but could not confirm the numbers that Nelson used.

> I didn't find anybody that generally agreed with [Nelson's] statement, among those people [in the prison system] that I interviewed.  They led me to believe that there would be situations -- and my experience tells me that there's situations -- where one or two or three officers might supervise large groups of inmates, for instance, on a recreation yard or chow hall or in a hallway or maybe in a gymnasium or something like that.

Supp. RR at 18.  He testified that this was referred to as "indirect supervision."  Supp. RR at 18.

Woods also testified that "TDC is such a complex operation and it consist of so many different and variety of units that it's impossible to come up with anything like a ratio that says there's so many officers to so many inmates."  Supp. RR at 19. Woods came up with an estimated worst ratio of one officer to eighteen inmates by doing "royal math," dividing the total number of prison officers on the TDC payroll by the total number of inmates listed as the TDC population, rather than using any actual data from the prison regarding supervision ratios that might have distinguished between the needs of different units and different levels of supervision.  Supp. RR at 19-20.[1]  Woods' opinion on this point appears to be little more than a guess.

During the cross-examination of Woods at the hearing on the motion for new trial, the prosecutor asked Woods if Nelson's testimony regarding this ratio was presented as an extreme example rather than a regular occurrence.  Woods did not disagree that a supervision ratio might on a rare occasion be higher, as Nelson suggested, but explained that he thought she was referring to a regular occurrence because she had "used the word 'often.'  That's what came out to me.  I think the word 'often' was in there, something like that.  That made it sound like it was common.  That's where I didn't agree with it."  Supp. RR at 43.  On that point, the prosecutor was content to "let the record speak to that."  Supp. RR at 43.

---

[1]     Woods contrasted his estimated worst ratio with the indirect supervision of large groups.  Supp. RR at 45.  He also testified that, in the distant past, he had supervised as many as 600 inmates by himself.  Supp. RR at 44.

During the trial, Nelson was asked whether the prison was understaffed.  She responded,

> That's very easily said.  Yes sir.  We are very underpaid. And for one -- you know for every one staff member they **may** be in charge of **up to** 150 offenders.  You can't -- you know they can't keep a direct eye on all 150 of those offenders.  So you're watching one and ten are doing something else.

42 RR (docket entry 30-8) at 87 (emphasis added).  In this testimony, Nelson appears to set up the most extreme potential limits to point out how understaffing can impact an officer's ability to supervise inmates.  In fact, this testimony appears to refer to indirect supervision as it suggests that direct supervision is not possible for such a large ratio.

Nelson also mentioned this ratio during the trial, when asked whether an inmate would have a greater opportunity to commit violence if they went into a less restrictive general prison population category than they would if they went into administrative segregation or death row.  Nelson testified:

> Yes, sir.  The statistics of one correctional officer watching 150 versus two watching 84 -- I mean there's a large decrease in the amount of supervision that goes into watching a G2 offender or observing the actions of a G2 versus the actions of our administrative segregation offenders.

42 RR (docket entry 30-8) at 116.  Nelson's point in this testimony appears to focus on the increased opportunity in the general population to commit acts of violence

than there is in administrative segregation and not what the normal or appropriate direct supervision ratios in the prison system would be.

On this point, Woods agreed that there was a greater opportunity for prisoners in the general prison population to commit acts of violence, that there was greater freedom in the general population, that there was a greater number of incidents in the general population due to the greater numbers, and that prisoners in administrative segregation are highly controlled and guarded at a higher rate than those in the general population.  Supp. RR (docket entry 30) at 23, 47.  But Woods also believed that the prisoners in administrative segregation had a greater desire to commit acts of violence, emphasizing, however, that this was only his opinion based on common sense and not on any hard evidence.  "I don't know that I can support that statistically.  It's common sense.  They're bad inmates and they would be more likely to want to act out on the officers."  Supp. RR (docket entry 30) at 24-25.  On cross-examination, Woods acknowledged that Nelson had corrected the prosecutor regarding this subject and did not leave the impression that the general population had the worst violence in the prison.  Supp. RR (docket entry 30) at 47-48.

Regarding Nelson's testimony that the Texas Department of Criminal Justice was 4,000 correctional officers short the prior year, Woods testified that there was a shortage but guessed that it would not have been that high.

> Well that's a continuing problem with the agency, is
> overturn of staff.  I'm not sure about the 4,000 number

being an accurate number.  I do know that two weeks ago
they were down by 900 officers system wide which with a
110 or so units, that means it's probably about ten per
unit.

* * *

As far as a year ago, I try to keep up with current trends at
TDC because of the work that I do and things.  The 4,000,
I think, was high.  I don't know how high, but I think it
was high for a year ago.

Supp. RR (docket entry 30) at 26.

Regarding Nelson's testimony that an inmate in the general population can

come and go from their cells to work, the CCA thoroughly compared the testimony of

Nelson and Woods on this issue and found that they were "substantially identical."

*Robertson*, 2011 WL 1161381 at *10.

Finally, Nelson testified at trial that she would agree with the defense counsel's

statement that the prison is filled with psychopaths.  42 RR (docket entry 30-8) at

111, 116.  In the hearing on the motion for new trial, Woods did not present any

facts or statistics on this point, and agreed that there were probably more

psychopaths in the prison system, but doubted that there would be very much more.

"We probably have more in the prison system because they're criminally oriented in

a lot of cases.  But I wouldn't suspect the population of psychopaths in the prison is

too terribly much higher than that outside the prison."  Supp. RR (docket entry 30)

at 30.  Again, Woods' language suggests no more than a guess.

- 39 -

Robertson also called Dr. Mark Vigen in support of his motion for new trial to establish that, although he was present and heard Nelson's testimony, Vigen would not have been able to testify during the trial on these matters because of the time it would take for him to obtain the necessary data.  Supp. RR (docket entry 30) at 73-75.  Although Vigen had expressed concerns to defense counsel about some of Nelson's opinions, he didn't have the data he thought he would need to dispute them.  Supp. RR (docket entry 30) at 73-75.  Specifically, Vigen testified that Nelson had a different understanding than he did about the things raised in the motion for new trial, such as whether an inmate would "automatically" receive G3 status and whether the prison had been 4,000 officers short, and he later consulted with Woods regarding those things before the hearing on the motion for new trial.  Supp. RR (docket entry 30) at 78-81.  Vigen also testified that he had evaluated Robertson and, if called at trial, would have offered the opinion that Robertson "would qualify for the diagnosis of anti-social personality disorder and that he had psychopathic tendencies."  Supp. RR (docket entry 30) at 82.

After noting the lack of a trial objection to Nelson's testimony and leaving open the question of whether Robertson's complaints were preserved, the CCA analyzed each of these items of disputed expert opinion and concluded that Robertson had not demonstrated Nelson's testimony to be false or misleading and

had not shown that the trial court abused its discretion in denying the motion for new trial.  See *Robertson*, 2011 WL 1161381 at *7-10.

## B. Law

Robertson relies upon *Napue v. Illinois*, 360 U.S. 264, 269 (1959), in support of his argument that a conviction obtained through perjury, known to be such by representatives of the State, violates due process, even when the State, although not soliciting the perjury, allows it to go uncorrected when it appears.  Amended Petition at 59.  To prove a due process violation under *Napue*, a petitioner must establish that (1) the testimony was false, (2) the government knew the testimony was false, and (3) the testimony was material.  See *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005), *cert. denied*, 549 U.S. 840 (2006); *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002).

Robertson also relies upon *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988), in support of his assertion that his death sentence was procured in violation of the Eighth Amendment because it was based on "materially inaccurate" evidence. Amended Petition at 61-62; Reply at 8.  The United States Court of Appeals for the Fifth Circuit has held that, notwithstanding the difference between a claim of false testimony and the use of an invalid aggravator, to sustain a claim under *Johnson*, a habeas petitioner must establish that the testimony was "false and material."  See *Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir.) (citing *Fuller v. Johnson*, 114 F.3d

491, 497 (5th Cir. 1997), *cert. denied*, 531 U.S. 966 (2000)).[2]  This would correspond

with two of the three elements of a due process claim under *Napue*.

## C.  Analysis

Robertson argues that he is entitled to relief because the state court's decision

to deny relief was contrary to and an unreasonable application of federal law, and

also was based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings.  Amended Petition at 57, 61-62 (citing 28

U.S.C. § 2254(d)).  In addition to the five areas of concern with Nelson's testimony

presented to the CCA, however, Robertson also asserts that Nelson had given false

testimony in a different trial affecting her credibility that was never revealed to

Robertson's jury, and that she had "testified to a speculative 'parade of horribles,'

with no evidence whatsoever that Mr. Robertson had altered his coffee pot and

scalded a guard with boiling water, or broke his headphones and transmitted gang

information."  Amended Petition at 53, 57-59.

---

[2]      Robertson also argues an opinion of the CCA in support of this claim.
Amended Petition at 59 (citing *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim.
App. 2010)); Reply at 8-9.  Under § 2254(d), however, only a state court decision
that is "contrary to, or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United States" can make the
required showing.  This would not include state court decisions, but "only 'the
holdings, as opposed to the dicta, of [United States Supreme Court] decisions.'"
*Woodall*, 134 S. Ct. at 1702.

Were this court to consider these additional assertions as part of the claim presented in these proceedings, it would render the entire claim unexhausted and, now, subject to a procedural bar by the Texas abuse-of-the-writ rule.  See *Coleman*, 501 U.S. at 735 n.1; *Woodfox*, 609 F.3d at 793.  This state rule is an independent and adequate state ground for to support a procedural bar against federal habeas review. *Canales*, 765 F.3d at 566.  It is unnecessary, however, to construe this claim as unexhausted and procedurally barred.

Because Robertson argues only that the state court's decision was unreasonable under § 2254(d), this court should properly limit itself to the asserted § 2254(d) inquiry.  Under that standard, Robertson's new evidence and arguments cannot be considered by this court because they were not part of the claim submitted to the CCA on direct appeal.  See *Pinholster*, 563 U.S. at 185.

In the alternative, these additional assertions would lack merit.  Robertson complains that Nelson gave inaccurate testimony in another capital case about the classification status of that other defendant (Juan Lizcano) that Robinson's jury never heard.  Amended Petition at 59.  At the hearing on Robertson's motion for new trial, Robertson's counsel agreed with the State that the testimony in that other case did not apply to Robertson because it was limited to inmates sentenced to life without parole.  Supp. RR (docket entry 30) at 4-5.  Robertson has not shown that Nelson's testimony in that other case would have been relevant to Nelson's

testimony in Robertson's case and admissible to impeach her.  Therefore, even if this issue had been exhausted, it lacks merit.

Further, Robertson has not shown that any of Nelson's testimony regarding the so-called "parade of horribles" was in any way false or misleading.  Nelson explained that Robertson's prison disciplinary infractions may "sound like nothing" but are based in rules that are designed to protect both the inmates and the guards from certain safety and security risks that she described.  42 RR (docket entry 30-8) at 98-103.  Robertson does not attempt to show that any of Nelson's testimony regarding these items was incorrect or in conflict with any testimony of his expert, Woods.  Robertson merely complains that the CCA later characterized these prison infractions as "minor."  Amended Petition at 58.

In any event, Robertson has not shown that the state court unreasonably determined that Nelson's testimony was not false or misleading.  In fact, the state court's determinations appear to be correct.

A mere disagreement between experts is not normally sufficient to show that the opinion testimony of one of them is false or misleading.  See *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996) (holding that "the fact that other experts disagreed" was insufficient to show the state's expert testimony to be false or misleading), *cert. denied*, 519 U.S. 1120 (1997); *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir.) (holding disagreement between experts was insufficient to overcome state habeas court's

factual determination that the prosecution expert's testimony was not false or misleading), *cert. denied*, 531 U.S. 831 (2000); *Harris v. Vasquez*, 949 F.2d 1497, 1524 (9th Cir. 1990) (holding that conflicting psychiatric opinions did not show that the state's expert testimony was false, noting that "psychiatrists disagree widely and frequently" (quoting *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985)), *cert. denied*, 503 U.S. 910 (1992)); *Campbell v. Gregory*, 867 F.2d 1146, 1148 (8th Cir. 1989) (presenting differing testimony from new expert in motion for new trial did not establish falsity of prior expert's opinion offered at trial); *Devoe v. Davis*, No. A-14-CA-151-SS, 2016 WL 5408169, at *18 (W.D. Tex. Sept. 27, 2016) (rejecting claim that state presented false or misleading expert testimony regarding the TDCJ's inmate classification system). But even if it could be sufficient, Robertson's expert testimony would not.

Robertson's expert, Woods, did not accuse Nelson of perjury but expressed his opinions as speculation about the accuracy of her opinions and disagreement with word choices. Woods admitted that he did not have the hard evidence or statistics to disprove Nelson and used language indicating that he was guessing she was probably wrong. Rather than accusing Nelson of testifying falsely, Woods emphasized that he merely disagreed with her choice of words or focused on language that he read into the transcript of her testimony that does not appear in the record before this court.

This is patently insufficient to show Nelson's testimony to be false or misleading in violation of the Constitution.

Robertson has not overcome the presumption of correctness afforded state court findings, much less shown that the state court unreasonably determined that Nelson's testimony was not false or misleading in violation of the Constitution.  In fact, the record before this court supports the state court's decision.  Therefore, Robertson's second claim is **DENIED**.

## VII

Robertson's application for a writ of habeas corpus is **DENIED**.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the court **DENIES** Robertson a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.  See *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2).  If Robertson files a notice of appeal, he may proceed *in forma pauperis* on appeal.

**SO ORDERED**.

March 30, 2017.

_A. Joe Fish_____
**A. JOE FISH**
**Senior United States District Judge**